Louis J. Lefkowitz, as Attorney-General of the State of New York, Appellant-Respondent, v Harry Lebensfeld et al., Respondents-Appellants.

First Department, June 26, 1979

## APPEARANCES OF COUNSEL

*Bernard Toomin* of counsel *(Warren M. Goidel* with him on the briefs; *Robert Abrams, Attorney-General),* for appellant-respondent.

*Edward Brodsky* of counsel *(William J. McSherry, Jr.,* and *Robert D. Marafioti* with him on the brief; *Spengler Carlson Gubar Churchill & Brodsky,* attorneys), for respondents-appellants.

## OPINION OF THE COURT

SULLIVAN, J. P.

The issue before us is whether the Attorney-General, purporting to represent the ultimate beneficiaries of a charitable organization, which is the donee of an unconditional gift of corporate stock, has standing to sue the corporation to compel both the declaration and payment of dividends and the payment of market value of those shares repurchased from the donee corporation at less than market value. We hold that no standing exists.

The defendants are United Industrial Syndicate, Inc. (United), a closely held corporation, and its directors. One of the directors, Harry Lebensfeld, owns a controlling interest in the corporation's common voting stock. In 1968 and 1969 Lebensfeld donated, without restriction, shares of United's annual cumulative first preferred stock to a number of charitable organizations. United's certificate of incorporation provides that holders of first preferred stock are entitled to

receive a cash dividend of $6 per annum, payable semiannually "when and as declared by the Board of Directors". Dividends have been declared in the years since the gifts were made, but the dividends declared and paid were in the range of $1 to $3.50, and thus less than the maximum dividend provided for in the certificate of incorporation.

In 1977, several charitable organizations, including the Federation of Jewish Philanthropies of New York (the Federation group), which were the recipients of gifts of first preferred stock from Lebensfeld, commenced an action against United and its directors to compel them to pay all dividend arrearages and to declare and pay full dividends in future years. The gist of the complaint was that the defendants breached their fiduciary duties to the shareholder plaintiffs by failing over the last few years to declare the highest dividends payable, notwithstanding that United had more than sufficient financial resources to do so.

Six other charitable organizations, including Lincoln Center for the Performing Arts (the Lincoln Center group), also the recipients of cumulative first preferred stock from Lebensfeld, and the holders of 16,793 shares of such stock on which full dividends had not been declared and paid, neither joined in that action nor commenced their own.

Some 13 months later, after these other shareholder-charitable organizations failed either to join in the Federation lawsuit or commence their own action, the Attorney-General instituted this action, purporting to act as the sole, inherent and statutory representative of the ultimate indefinite and uncertain beneficiaries of these charitable organizations. The "ultimate beneficiaries", as the Attorney-General denominates them, are the members of the public who are served by each of the charities.

Two causes of action are pleaded. The first is virtually identical to the complaint in the Federation action and seeks the same relief. It is alleged that the dividend deficiency is $933,690.80. In the second cause of action the Attorney-General charges the defendants with the breach of fiduciary duties to yet another group of shareholder-charitable organizations (the Dartmouth group), in that in 1975 United repurchased their shares of the Lebensfeld-donated first preferred stock at a price less than full market value. As his prayer for relief in the second cause of action, the Attorney-General demands that United be compelled to "pay to charitable institutions

selected by the Court" the difference between the price paid by United and fair market value, as well as the arrearages for the accumulated dividends for the period 1964 to 1975. The Attorney-General contends that United's redemption of the first preferred stock constituted an unconscionable and unfair overreaching and violation of its fiduciary duty to a minority shareholder, resulting in a diminution of the charitable institutions' funds to the detriment of the ultimate charitable beneficiaries.

In support of his claim to be the representative of the ultimate beneficiaries of these charitable organizations, the Attorney-General relies upon EPTL 8-1.1 (subd [f]) which provides that, "The attorney general shall represent the beneficiaries of * * * dispositions [of property] for religious, charitable, educational or benevolent purposes and it shall be his duty to enforce the rights of such beneficiaries by appropriate proceedings in the courts."

The defendants moved for an order of dismissal on the grounds that the Attorney-General lacks the legal capacity to sue and that the complaint fails to state a cause of action. (CPLR 3211, subd [a], pars 3, 7.) It appears that before commencing this action the Attorney-General did not make a demand on the directors or trustees of any of these charitable organizations that the charitable organizations themselves bring suit to protect their interests. Holding the absence of such a demand to be fatal (see *Matter of Gebbie,* 33 AD2d 1093, 1094, mot for lv to app den 27 NY2d 482), Special Term granted the motion and dismissed the complaint, except for· that part of the first cause of action as relates to the Lebensfeld Foundation. Special Term found, without explanation or apparent justification, that a demand upon the trustees of that foundation would be futile since the defendant Lebensfeld is the principal stockholder of United.

Both sides appeal, the Attorney-General seeking to have the dismissed actions reinstated on the ground that a demand was not necessary, while the defendants claim, *inter alia,* that demand or not, the Attorney-General is without standing to sue.

EPTL 8-1.1, upon which the Attorney-General relies for standing, is the culmination of a line of statutory enactments, beginning with the Tilden Act (L 1893, ch 701), which were intended to redress the confused approach New York took toward the validity of charitable trusts which, because of the

indefiniteness or uncertainty of the intended beneficiaries, ran afoul of the requirement at common law that the beneficiaries of a trust be specifically identifiable. (See, generally, 4 Scott, Trusts [3d ed], § 348.)

In 1788 the New York Legislature repealed the English Statute of Charitable Uses which had recognized the validity of charitable trusts, notwithstanding the lack of specific beneficiaries or the fact that the ultimate recipients of the charity could not be ascertained. In 1829 the Legislature enacted the Revised Statutes, which authorized four types of express trusts, all dealing with real property, none of which was charitable. The question arose as to whether the Legislature intended to abolish gifts and devises to charitable uses. Fifteen years after the Revised Statutes' enactment, in *Shotwell v Mott* (2 Sandf Ch 46), the Court of Chancery found that the revision dealt with private trusts and was not intended to affect charitable uses. To hold otherwise, the court concluded, would be "contrary to the public interests, and * * * repugnant to the spirit of the age." *(Shotwell v Mott, supra,* p 52.)

Charitable trusts of personal property were subsequently upheld by the Court of Appeals in *Williams v Williams* (8 NY 525). The court found that "the law of charities was, at an indefinite but early period in English judicial history, engrafted upon the common law" *(Williams v Williams, supra,* p 542), and thus concluded that the enactment of the Revised Statutes in 1829 did not abolish charitable uses altogether. This decision was criticized 12 years later in *Levy v Levy* (33 NY 97). There, the court reasoned that by repealing the English statute the New York Legislature intended to abolish all charitable trusts, observing: "To my mind, the evidence is irresistible, that the legislature of 1788 intended to abrogate (and that that was the effect of their action) the whole law of charitable uses, as understood and enforced in England. If the law of charity, as it existed at the time of the revolution, was based upon the statute of Elizabeth, then the repeal of that statute directly worked its abrogation. If the system of indefinite charities could be enforced in equity, prior to the statute, it was, nevertheless, the intention, by such repeal, to abrogate the system; and the effect of the repeal, and the contemporaneous initiation of a different policy, and one better suited to our social and political condition, was to effectually displace it." *(Levy v Levy, supra,* p 111.) Nor did the court look favorably on the concept that the law of charitable uses had

its origins in the common law. Although conceding instances of enforcement at chancery, it stated: "If there be a single postulate of the * * * law, established by an unbroken line of decision, it is, that a trust without a certain beneficiary who can claim its enforcement, is void, whether good or bad, wise or unwise". *(Levy v Levy, supra,* p 107.)

In *Bascom v Albertson* (34 NY 584), the court cited a number of post-*Williams* decisions, all critical of *Williams,* and voided a charitable bequest, reasoning that the English chancery court did not have inherent "judicial" jurisdiction, but exercised jurisdiction by virtue of the royal prerogative and cy pres power with which the courts of this State had not been invested. In 1873, the Court of Appeals overruled *Williams,* for all intents, and held the English law of charitable uses inapplicable to New York because the Legislature had enacted a statute of uses and trusts and a statute against perpetuities which did not provide for "perpetual trusts for charity, or for the benefit of classes or of corporations". *(Holmes v Mead,* 52 NY 332, 339.) The opinion noted that, "Courts are not at liberty to introduce an exception into an act which the legislature has not thought proper to declare". *(Holmes v Mead, supra,* pp 338-339.)

In 1891 the Court of Appeals reinforced its post-*Williams* holdings by abrogating a trust created by Samuel Tilden for the establishment and maintenance of a free library system in New York City,[1] noting that, "The equitable rule that prevailed in the English Court of Chancery known as the *cy pres* doctrine and which was applied to uphold gifts for charitable purposes when no beneficiary was named has no place in the jurisprudence of this State. [Citations omitted]".[2] *(Tilden v Green,* 130 NY 29, 45.) The public uproar resulting from the loss of such a substantial charitable disposition led the Legislature, two years later, to pass the Tilden Act, the statutory forerunner of EPTL 8-1.1. That act provided that gifts for

---

1. The court held that the bequest was void because the ultimate beneficiaries—the users of library facilities—were not definite and ascertainable so as to be capable of enforcing the trust.

2. Cy pres, now codified as part of article 8 of the EPTL (8-1.1, subd [c]), is the principle that equity will make specific a general charitable intent of a settlor; and will when an original specific intent becomes impossible or impracticable of fulfillment, substitute another plan of administration which is believed to approach the original scheme as closely as possible. It is the theory that equity has the power to mold the charitable trust to meet emergencies. (Bogert, Law of Trusts and Trustees, § 431.)

charitable uses could not be "deemed invalid by reason of the indefiniteness or uncertainty of" their beneficiaries (L 1893, ch 701, § 1), and empowered the Attorney-General to represent the beneficiaries in such cases (L 1893, ch 701, § 2). After the Tilden Act, but before the enactment of the EPTL, these provisions were part of section 12 of the Personal Property Law and section 113 of the Real Property Law.

In the same year that *Holmes* was decided and the court held that charitable trusts were no longer valid in New York by virtue of the repeal of the English statute in 1788, the Court of Appeals found no defect in a bequest to a charitable corporation which was permitted to expend only the income, and was required to keep the principal of the gift intact. *(Wetmore v Parker,* 52 NY 450.) The court refuted the idea that a trust had been created: "There is nothing *contingent* about it; it is fixed and certain; there is nothing *expectant* or *future* about it; but its interest is immediate and vested. * * * No mortmain law, restrictive as they have sometimes been, ever prevented the donors from making their gifts in such terms as would preserve the principal from dissipation. It does not create a trust in any such sense, as that term is applied to property. The corporation uses the property, in accordance with the law of its creation, for its own purposes; and the dictation of the manner of its use, within the law by the donor, does not affect its ownership or make it a trustee. A person may transform himself into a trustee for another, but he cannot be a trustee for himself. (Lewin on Trusts, 15.)" *(Wetmore v Parker, supra,* pp 458-459; see, also, *Bird v Merklee,* 144 NY 544.)

In light of *Wetmore* it is apparent that the Tilden Act, despite the use of the word "gifts", was not essential to the validity of dispositions to charitable corporations, but rather was necessary to prevent the failure of charitable trusts, otherwise valid, because of the indefiniteness of the intended beneficiaries, and to provide for their enforcement by the Attorney-General.

Dispositions to charitable corporations for stated purposes had always received judicial recognition (see *Wetmore v Parker,* 52 NY 450, *supra),* and equity had endowed the Attorney-General with the power to secure the accomplishment of the intended purpose: "[E]quity will afford protection to a donor to a charitable corporation in that the Attorney-General may maintain a suit to compel the property to be held for the

charitable purpose for which it was given to the corporation. (American Law Institute, Restatement of the Law of Trusts, vol. 2, ch. 11, p. 1091.) Nothing in authority, statute or public policy has been brought to our attention which prevents a testator from leaving his money to a charitable corporation and having his clearly expressed intention enforced." *(St. Joseph's Hosp. v Bennett,* 281 NY 115, 119.)

More recently the rule was stated: "The general rule is that charitable trusts or gifts to charitable corporations for stated purposes are enforcible *[sic]* at the instance of the Attorney-General. * * * It matters not whether the gift is absolute or in trust or whether a technical condition is attached to the gift. Equity 'will afford protection to a donor to a charitable corporation in that the Attorney-General may maintain a suit to compel the property to be held for the charitable purpose for which it was given to the corporation.' * * * Persons having a special interest are sometimes permitted to maintain a suit to enforce a charitable trust * * * but those who can enjoy the status of beneficiary only when selected by the trustees are generally held to have no right to initiate a proceeding. [Citations omitted]" *(Matter of James,* 22 Misc 2d 1062, 1067-1068; see, also, *Levy v Levy,* 33 NY 97, 108).

Thus, it is clear that the Attorney-General's powers of representation and enforcement, whether of statutory or equity origin, are not limited to express trusts, but encompass those charitable dispositions where property has been donated for a specific purpose. In such cases a trust will be "implied in the sense that the donated property will be required to be used for the purposes for which it was given and it is the duty and responsibility of the attorney general to require that these purposes be effectuated". (See Greenfield, Practice Commentaries, McKinney's Cons Laws of NY, Book 17-B, EPTL 8-1.1, 1978-1979 Supp, p 111.) This does not mean, however, that the Attorney-General has standing to represent those who might eventually reap the benefit of gifts made without a specified purpose to charitable organizations. In such cases, the charity implicitly receives the gift for its own use, consistent with its charitable purposes. There are no beneficiaries, legally cognizable, apart from the donee, and the charity may use the gift as it sees fit, in accordance with the laws of its creation.

The theory underlying the power of the Attorney-General to enforce gifts for a stated purpose is that a donor who attaches

conditions to his gift has a right to have his intention enforced. (See *St. Joseph's Hosp. v Bennett,* 281 NY 115, 119, *supra.)* But a donor who has attached no conditions has no such expectation. He is, in effect, relying on the good will and judgment of the donee charity to utilize his gift in what the donee perceives to be the most appropriate manner.

In enacting EPTL 8-1.1 (subd [f]), which is, with certain clarifying changes, a statutory carryover from the original Tilden Act, the Legislature substituted "charitable dispositions" for "trusts". The purpose of this change was not to give the Attorney-General standing to sue as representative of the ultimate beneficiaries of any charitable gift, but rather to reflect the full extent of his equitable powers under case law. (See, e.g., *St. Joseph's Hosp. v Bennett,* 281 NY 115, *supra; Matter of James,* 22 Misc 2d 1062, *supra.)* These cases reflect the never disturbed equitable doctrine that although gifts to a charitable organization do not create a trust in the technical sense, where a purpose is stated a trust will be implied, and the disposition enforced by the Attorney-General, pursuant to his duty to effectuate the donor's wishes. But where, as here, there has been a completed, unconditional, irrevocable gift of stock to a charity, there is neither any intention of the donor for the Attorney-General to protect, nor any beneficiaries to represent. The charitable organizations hold neither the stock, nor any consequent dividends in trust, express or implied, for anyone else.

Citing numerous authorities, the Attorney-General contends that his right to enforce charitable dispositions is primary. No one challenges the primacy of the Attorney-General's authority in the appropriate case. None of the cited cases, however, supports his position here. *Allen v Stevens* (161 NY 121), *Trustees of Sailors' Snug Harbor v Carmody* (158 App Div 738, affd 211 NY 286), *Matter of Birch* (50 AD2d 475), and *Matter of Rothko* (84 Misc 2d 830, mod 56 AD2d 499, affd 43 NY2d 305) all involved express trusts. *Sherman v Richmond Hose Co. No. 2* (230 NY 462) and *Matter of Lachat* (184 Misc 492) involved implied trusts. In both *Matter of Kearns* (38 AD2d 808) and *Matter of Notkin* (45 AD2d 849),[3] it was held that the Attorney-General had standing to object to an executor's

3. If the bequest in *Notkin* was an unconditional gift to a charity and to the extent that the court relied on EPTL 8-1.1 (subd [f]) for standing, we respectfully disagree. Standing is derived from EPTL 8-1.4 (subd [e], par [1], cl [D]) as part of the statutory scheme giving the Attorney-General supervisory powers over charitable corporations.

settlement and account. However, under the specific statutory powers given him (EPTL 8-1.4, subd [e], par [1], cl [D]), the Attorney-General is entitled to notice of any accounting by a trustee holding property or income therefrom which may be required to be devoted to charitable purposes to assure that a charitable bequest is honored.

Stripped of its rhetoric, the complaint asserts an alleged failure to declare and pay dividends and to pay a fair redemption price as to stock donated to the charitable organizations over 10 years ago. Premised upon the fact that the shareholder is a charitable corporation, to which the stock has been donated, and the fortuitous circumstance that Lebensfeld, the donor, may well dictate corporate decisions, thereby controlling the declaration of dividends, the Attorney-General contends that the corporate obligation to pay dividends and to pay fair market value for the repurchase of the stock is part and parcel of the charitable disposition, and that his standing is derived from his inherent and statutory right to enforce such dispositions. Apart from the questionable validity of the premise that what is involved here is the enforcement of a gift, rather than the enforcement of shareholder rights against a corporation, it should be emphasized that there is no class of beneficiaries for the Attorney-General to represent, as defined by any conditions or purposes attached to the gift by the donor. The Attorney-General represents not charitable organizations, but rather the ultimate beneficiaries of charitable dispositions.

In holding that the Attorney-General is without standing, we are not unaware of his wide range of supervisory powers over the trustees of property held for charitable purposes, including nonprofit corporations either organized for charitable purposes under the laws of this State, or doing business or holding property in this State. (EPTL 8-1.4.) These powers include the right to proceed against the directors or trustees of a charitable organization. (EPTL 8-1.4, subd [m]; Not-For-Profit Corporation Law, § 112, subd [a], par [7].) But this statutory supervisory power over charitable corporations should not be confused with standing to represent and enforce the right of so-called beneficiaries of a gift to charitable organizations. Standing to sue and supervisory powers are entirely separate legal principles.

Nor does the Not-For-Profit Corporation Law provide the Attorney-General with standing. Sections 719 and 720, to

which the dissent makes reference, authorize the Attorney-General to bring an action against the directors and officers of a charitable corporation for certain specified types of misconduct. Section 112 (subd [a], par [7]), although not pleaded in the complaint as conferring authority to institute this proceeding, is cited by the Attorney-General in his brief. It is inapplicable. The section would allow the Attorney-General to bring an action to enforce any right afforded under the Not-For-Profit Corporation Law "to members, a director or an officer" of a charitable corporation, but nothing in the statute authorizes a third-party action in behalf of any member, director or officer.

In view of our holding that the Attorney-General lacks standing to bring this lawsuit, we need not reach the issue of whether a demand upon the directors of the charitable organizations is a prerequisite to its commencement. Nor is it necessary to consider whether the second cause of action, brought in behalf of the ultimate charitable beneficiaries of the Dartmouth group, states a cause of action.

Accordingly, the order, Supreme Court, New York County (FRAIMAN, J.), entered September 8, 1978, granting defendants' motion to dismiss the amended complaint except insofar as it asserted a cause of action on behalf of the ultimate charitable beneficiaries of the Lebensfeld Foundation should be modified, on the law, without costs or disbursements, so as to dismiss the complaint as to the Lebensfeld Foundation, and, except as thus modified, affirmed.

SILVERMAN, J. (dissenting in part). I would affirm the order appealed from.

The original Tilden Act (L 1893, ch 701) was precipitated by the decision of the Court of Appeals in *Tilden v Green* (130 NY 29) applying the then New York rule as enunciated in *Holmes v Mead* (52 NY 332), invalidating certain charitable trusts, in part for want of a definite beneficiary, because of the rule against perpetuities, and because of the restrictions on the kinds of trusts permitted in New York under the Revised Statutes. The act was designed to restore the law of charitable trusts as it had existed in New York before *Holmes v Mead.* (*Allen v Stevens,* 161 NY 122, 141.) The act represented primarily a change in the substantive law; its grant of additional powers to the Attorney-General was merely incidental to the change in substantive law. Thus, section 1 of the act made the change in the substantive law; and section 2 gave

powers to the Supreme Court and the Attorney-General in relation to the charitable dispositions provided for in section 1. *(Allen v Stevens, supra.)*

But the substantive law of New York governing the creation and existence of charitable trusts and institutions did not begin with the Tilden Act, and was not exhausted by it. And neither were the functions of the courts and the Attorney-General in relation to them. The act and its successors, now EPTL article 8, and the functions of the Attorney-General in relation to charities, have long since outgrown the circumstances of the particular case which precipitated the original Tilden Act. The need for the State to supervise charities has grown particularly with the proliferation of private charities and foundations. EPTL article 8 is an important part of the statutory scheme for the regulation by the State of such charities. It should be and has been given broad interpretation far beyond the original circumstances of the *Tilden* case, and the State, in large part under this statute, supervises the entire field of the administration of charities. That supervision is entrusted by the statute to the courts, e.g., EPTL 8-1.1 (subds [c], [g]), and particularly in proceedings in which the Attorney-General participates (EPTL 8-1.1, subd [f]).

The functions of the Attorney-General in this connection have not been limited to claims to enforce charitable dispositions, but have included the proper administration of the properties of charitable trusts and corporations. And the statutes themselves indicate that the Attorney-General's powers are not limited to enforcement of the charitable dispositions or to claims against the directors or trustees. The following provisions of EPTL 8-1.4 indicate this broad jurisdiction:

"Supervision of trusteees for charitable purposes.

"(a) For the purposes of this section, 'trustee' means (1) any individual, group of individuals, corporation or other legal entity holding and administering property for charitable purposes, whether pursuant to any will, other instrument or agreement, court appointment, or otherwise pursuant to law, over which the attorney general has enforcement or supervisory powers, (2) any non-profit corporation organized under the laws of this state for charitable purposes, and (3) any non-profit foreign corporation organized for charitable purposes, doing business or holding property in this state. * * *

"(e) (1) Whenever any trustee or other person, holding

property or any income therefrom which may be required at any time to be devoted to charitable purposes, shall file in any court in this state (A) any petition for instructions relating to the administration or use of such property or income * * * (C) any petition respecting the disposition or distribution of such property or income * * * due notice of the action or proceeding shall be served by the petitioner upon the attorney general together with a copy of any petition, accounting, will or trust instrument * * *

"(i) The attorney general may investigate transactions and relationships of trustees for the purpose of determining whether or not property held for charitable purposes has been and is being properly administered. * * *

"(m) The attorney general may institute appropriate proceedings to secure compliance with this section and to secure the proper administration of any trust, corporation or other relationship to which this section applies. * * *

"(n) This section shall apply regardless of any contrary provisions of any instrument and shall be liberally construed so as to effectuate its general purpose of protecting the public interest in charitable uses, purposes and dispositions."

Again, section 720 of the Not-For-Profit Corporation Law provides:

"Action against directors and officers for misconduct.

"(a) An action may be brought against one or more directors or officers of a corporation to procure a judgment for the following relief: * * *

"(2) To set aside an unlawful conveyance, assignment or transfer of corporate assets, where the transferee knew of its unlawfulness. * * *

"(b) An action may be brought for the relief provided in this section and in paragraph (a) of section 719 (Liabilities of directors in certain cases) by the attorney general, by the corporation, or, in the right of the corporation, by any of the following".

The Appellate Divisions in both the Second and Fourth Departments have indicated that the Attorney-General has a function in suing to protect property dedicated to charitable uses even where the direct charitable beneficiary or foundation may be opposed. (Cf. *Matter of Gebbie,* 33 AD2d 1093; *Matter of Notkin,* 45 AD2d 849, 850, "it is the Attorney-General's duty to enforce the rights of charitable beneficiaries,

even if it results in his being at cross purposes with such beneficiaries.") The Second and Fourth Departments have differed only as to whether the Attorney-General has to first make a demand on the charitable beneficiary. Defendants distinguish these cases on the ground that they involved express charitable trusts. But I think the power of the Attorney-General is quite the same, whether we deal with an express trust or a nonprofit charitable corporation. (Cf. EPTL 8-1.4, subd [a].)

In the recent case of *Matter of Rothko* (43 NY2d 305), the Attorney-General was permitted to sue third persons who were themselves not charitable donors or donees to set aside transactions between a charitable trust or foundation on the one hand and these third persons. While the status of the Attorney-General appears not to have been expressly discussed in the appeals in that case, the Surrogate did expressly consider the matter in an earlier opinion of his in that case. (NYLJ, Dec. 22, 1972, p 15, col 4.) He relied, among other things, on EPTL 8-1.4 (subd [m]). In that case the position of the Attorney-General was in a certain sense further removed than in this case. The Attorney-General, on behalf of the ultimate beneficiaries of a foundation which was the residuary legatee under a will, was permitted to attack certain transactions between the executors and third persons, the result of which was claimed to be injurious to the interests of the ultimate beneficiaries of the foundation. It is true that, as the Surrogate pointed out, striking the Attorney-General's objection would not eliminate any issue existing in the proceeding because the testator's children were making substantially the same objections. But the Surrogate pointed out that if the Attorney-General were not in the case, the ultimate charitable beneficiaries would be without a spokesman, in part because the allegedly wrongdoing executors constituted one half the board of directors of the foundation.

In the circumstances, I am reluctant to say that the Attorney-General may not in a proper case bring an action to enforce a claim by a charitable corporation against a third person.

On the other hand, it hardly seems appropriate to authorize the Attorney-General without restriction to substitute his judgment for that of the directors of the charitable corporation with respect to the administration of the charity.

What Special Term did seems to me to be a reasonable and

sensible reconciliation of these considerations, i.e., to give the Attorney-General the same rights as a stockholder in a corporation would have—to enforce the corporation's rights in a derivative action in any case in which it can be shown that the directors, after due demand, have improperly refused to enforce those rights.

It is true that normally in a derivative action a corporation on whose behalf the action is brought should be joined as a party defendant. But actions need not be dismissed on that ground; the court may simply direct that the missing person be joined. (CPLR 1003.)

In this case, Special Term dismissed the actions where it appeared that the Attorney-General had failed to make a demand and it did not appear that such demand would be futile, and denied the motion to dismiss where it appeared that the demand would be futile. I agree.

MARKEWICH and ROSS, JJ., concur with SULLIVAN, J. P.; SILVERMAN, J., dissents in an opinion.

Order, Supreme Court, New York County, entered on September 8, 1978, modified, on the law, without costs and without disbursements, so as to dismiss the complaint as to the Lebensfeld Foundation, and except as thus modified, affirmed.