## CARL J. HERZOG FOUNDATION, INC. *v.*
## UNIVERSITY OF BRIDGEPORT
## (SC 15526)

Borden, Berdon, Norcott, Palmer and McDonald, Js.

Argued April 30—officially released August 26, 1997

*Frederick S. Gold,* with whom was *Sheila A. Huddleston,* for the appellant (defendant).

*John F. Lambert,* for the appellee (plaintiff).

*Ralph G. Elliot* filed a brief for the Connecticut Conference of Independent Colleges, Inc., et al. as amici curiae.

NORCOTT, J. The sole issue in this certified appeal is whether the Connecticut Uniform Management of Institutional Funds Act (CUMIFA), General Statutes §§ 45a-526 through 45a-534, establishes statutory standing for a donor to bring an action to enforce the terms of a completed charitable gift. Because we conclude that the legislature did not intend to establish donor standing under the circumstances of this case, we reverse the judgment of the Appellate Court.

The facts and procedural history of this case are aptly set forth in the Appellate Court opinion from which this appeal ensues. "The plaintiff [Carl J. Herzog Foundation, Inc.] commenced an action against the defendant, the University of Bridgeport, seeking injunctive and other relief in connection with a gift made by it to the defendant. The plaintiff alleged in its revised complaint that prior to August 12, 1986, it made various grants to the defendant 'to provide need-based merit

scholarship aid to disadvantaged students for medical related education.' On August 12, 1986, the plaintiff agreed, by letter, to participate in a matching grant program that would provide need-based merit scholarships to disadvantaged students for medical related education on a continuing basis. On September 9, 1986, the defendant wrote a letter accepting the offer of a matching grant of up to $250,000. Over a period of time, the defendant raised the necessary $250,000, which the plaintiff matched in accordance with the agreement. The plaintiff transferred $144,000 on June 26, 1987, and $106,000 on June 28, 1988, to the defendant. The grants were used to provide scholarships to students in the defendant's nursing program. On November 21, 1991, however, the plaintiff was informed that the defendant had closed its nursing school on June 20, 1991.

"Pursuant to the provisions of CUMIFA, the plaintiff alleged that the defendant was an 'institution' within the meaning of General Statutes § 45a-527 (1), that the matching grant constituted 'institutional funds' within the meaning of § 45a-527 (2), and that the letter of August 12, 1986, which set forth the restrictions and conditions of said grant, constituted a 'gift instrument' as defined in § 45a-527 (6). See *Yale University* v. *Blumenthal*, 225 Conn. 32, 621 A.2d 1304 (1993).

"The plaintiff's alleged injury is that the funds are no longer being used for their specified purpose. Paragraph fourteen of the revised complaint states: 'The [plaintiff] has been given to understand and believes that the said institutional funds have been co-mingled with the general funds of the [defendant], that said institutional funds are not being used in accordance with the "Gift Instrument" under which said institutional funds were transferred to [the defendant], and that said institutional funds have in fact been spent for general purposes of [the defendant].'

"The plaintiff requested a temporary and permanent injunction, ordering the defendant 'to segregate from its general funds matching grants totaling $250,000,' an accounting for the use of the fund from the date of receipt until present, and a reestablishment of the fund in accordance with the purposes outlined in the gift instrument, and, in the event that those purposes could not be fulfilled, to revert the funds and direct them to the Bridgeport Area Foundation, which is prepared to administer the funds in accordance with the original agreement.

"The defendant moved to dismiss the action for lack of subject matter jurisdiction on the ground that the plaintiff lacked standing. The trial court held that the act did not provide a donor with the right to enforce restrictions contained in a gift instrument, and, therefore, the plaintiff lacked standing to bring the action. The trial court noted that the attorney general, pursuant to General Statutes § 3-125,[1] could bring an action to enforce the gift, and it dismissed the action." *Carl J. Herzog Foundation, Inc.* v. *University of Bridgeport*, 41 Conn. App. 790, 791–93, 677 A.2d 1378 (1996).

The Appellate Court reversed the judgment of the trial court, concluding that General Statutes § 45a-533 provides donors with standing to enforce the terms of a completed gift, even though no such right of enforcement was provided for in the gift instrument. In light of the fact that § 45a-533 (a) provides that the governing board of an institution may release a restriction imposed by the donor in his or her gift instrument *with the written consent of the donor*, the Appellate Court reasoned that "[i]t would be anomalous for a statute to provide for written consent by a donor to change a

---

[1] General Statutes § 3-125 provides in relevant part that the attorney general "shall represent the public interest in the protection of any gifts, legacies or devises intended for public or charitable purposes. . . ."

restriction and then deny that donor access to the courts to complain of a change without such consent." Id., 803. In other words, the Appellate Court concluded that the statute, although silent on the matter, *implicitly* confers donor standing on the plaintiff. We disagree.

"Standing is established by showing that the party claiming it is authorized by statute to bring suit or is classically aggrieved." *Steeneck* v. *University of Bridgeport*, 235 Conn. 572, 579, 668 A.2d 688 (1995). The sole basis for standing claimed by the plaintiff is CUMIFA, more particularly, § 45a-533 (a). Our task, therefore, devolves into a question of statutory construction. We must determine whether the legislature intended CUMIFA to provide a donor that has made a completed charitable gift to an "institution" as defined by § 45a-527 (1), with standing to bring an action to enforce the terms of that gift where, as here, the gift instrument contained no express reservation of control over the disposition of the gift, such as a right of reverter or a right to redirect.

We begin by noting the common-law landscape upon which CUMIFA was enacted. We do so based on the applicability to this case of the well recognized principle of statutory construction that no statute "is to be construed as altering the common law, farther than its words import [and . . . a statute] is not to be construed as making any innovation upon the common law which it does not fairly express." (Internal quotation marks omitted.) *State* v. *Luzetti*, 230 Conn. 427, 433, 646 A.2d 85 (1994); see *State* v. *Sanchez*, 204 Conn. 472, 479, 528 A.2d 373 (1987); *Ahern* v. *New Haven*, 190 Conn. 77, 82, 459 A.2d 118 (1983).

At common law, a donor who has made a completed charitable contribution, whether as an absolute gift or in trust,[2] had no standing to bring an action to enforce

[2] The law governing the enforcement of charitable gifts is derived from the law of charitable trusts. See 4A A. Scott, Trusts (4th Ed. Fratcher 1989)

the terms of his or her gift or trust unless he or she had expressly reserved the right to do so. "Where property is given to a charitable corporation and it is directed by the terms of the gift to devote the property to a particular one of its purposes, it is under a duty, *enforceable at the suit of the [a]ttorney [g]eneral*, to devote the property to that purpose." (Emphasis added.) 2 Restatement (Second), Trusts § 348, comment (f), p. 212 (1959); *Attorney General* v. *First United Baptist Church of Lee,* 601 A.2d 96, 98 (Me. 1992); see *Sarkeys* v. *Independent School District No. 40,* 592 P.2d 529, 533 (Okla. 1979) ("[i]t has long been recognized at common law that the [a]ttorney [g]eneral has the duty of representing the public interest in securing the enforcement of charitable trusts"); *Wilbur* v. *University of Vermont,* 129 Vt. 33, 44, 270 A.2d 889 (1970) (where no provision in trust instrument for forfeiture or reverter, "the remedy for a breach of trust is by suit at the instance of the [a]ttorney [g]eneral of the state to compel compliance"). At common law, it was established that "[e]quity will afford protection to a donor to a charitable corporation in that *the [a]ttorney [g]eneral may maintain a suit* to compel the property to be held for the charitable purpose for which it was given to the corporation." (Emphasis added; internal quotation marks omitted.) *Lefkowitz* v. *Lebensfeld,* 68 App. Div. 488, 494–95, 417 N.Y.S. 2d 715 (1979). "The general rule

§ 348.1. "Ordinarily the principles and rules applicable to charitable trusts are applicable to [gifts to] charitable corporations." 2 Restatement (Second), Trusts § 348, comment (f), p. 212 (1959). The plaintiff's gift in the present case is undoubtedly a public gift subject to the enforcement procedures governing charitable trusts. The Appellate Division of the New York Supreme Court has recognized "the never disturbed equitable doctrine that although gifts to a charitable organization do not create a trust in the technical sense, where a purpose is stated a trust will be implied, and the disposition enforced by the [a]ttorney [g]eneral, pursuant to his duty to effectuate the donor's wishes." *Lefkowitz* v. *Lebensfeld,* 68 App. Div. 488, 496, 417 N.Y.S. 2d 715 (1979). We rely, therefore, to some extent, upon authorities discussing standing in the context of charitable trusts.

is that charitable trusts or gifts to charitable corporations for stated purposes are [enforceable] at the instance of the [a]ttorney [g]eneral. . . . It matters not whether the gift is absolute or in trust or whether a technical condition is attached to the gift."[3] (Internal quotation marks omitted.) Id., 495.

"The theory underlying the power of the [a]ttorney [g]eneral to enforce gifts for a stated purpose is that a donor who attaches conditions to his gift has a right to have his intention enforced." Id., 495–96. The donor's right, however, is enforceable only at the instance of the attorney general; *Wier* v. *Howard Hughes Medical Institute*, 407 A.2d 1051, 1057 (Del. 1979) (attorney general "has the *exclusive* power to bring actions to enforce charitable trusts" [emphasis added]); *Lopèz* v. *Medford Community Center, Inc.*, 384 Mass. 163, 167, 424 N.E.2d 229 (1981) (common-law rule that "it is the *exclusive* function of the [a]ttorney [g]eneral to correct abuses in the administration of a public charity by the institution of proper proceedings" [emphasis added]); and the donor himself has no standing to enforce the terms of his gift when he has not retained a specific right to control the property, such as a right of reverter, after relinquishing physical possession of it. See, e.g., *Marin*

---

[3] Public officials, such as the attorney general, had common-law standing to enforce charitable trusts because, by virtue of their positions, they are closely associated with the public nature of charities. A leading treatise on the subject states that "[t]he public benefits arising from the charitable trust justify the selection of some public official for its enforcement. Since the [a]ttorney [g]eneral is the governmental officer whose duties include the protection of the rights of the people of the state in general, it is natural that he has been chosen as the protector, supervisor, and enforcer of charitable trusts, both in England and in the several states . . . ." G. Bogert & G. Bogert, Trusts and Trustees (2d Rev. Ed. 1991) § 411, pp. 2–3. Connecticut is among the majority of jurisdictions that have codified this common-law rule and has entrusted the attorney general with the responsibility and duty to "represent the public interest in the protection of any gifts, legacies or devises intended for public or charitable purposes. . . ." General Statutes § 3-125.

*Hospital District* v. *Dept. of Health*, 92 Cal. App. 3d 442, 448, 154 Cal. Rptr. 838 (1979) (fact that charity is bound to use contributions for purposes for which they were given does not confer to *donor* standing to bring action to enforce terms of gift).[4] As a matter of common law, when a settlor of a trust or a donor of property to a charity fails specifically to provide for a reservation of rights in the trust or gift instrument, " 'neither the donor nor his heirs have any standing in court in a proceeding to compel the proper execution of the trust, except as relators.' " *Smith* v. *Thompson*, 266 Ill. App. 165, 169 (1932), quoting 2 J. Perry, Trusts and Trustees (7th Ed. 1929) § 732a, pp. 1255–56; see *Wilbur* v. *University of Vermont*, supra, 129 Vt. 44 (breach of trust "creates no right in the donor's heirs to enforce a resulting trust"); see also *Hagaman* v. *Board of Education*, 117 N.J. Super. 446, 454, 285 A.2d 63 (1971) (heirs of settlor generally cannot enforce charitable trust). "There is no such thing as a resulting trust with respect to a charity. . . . Where the donor has effectually passed out of himself all interest in the fund devoted to a charity, neither he nor those claiming under him have any standing in a court of equity as to its disposition and control."

---

[4] We note that it is well established in the context of charitable trusts that there are others, in addition to the attorney general, who may enforce the terms of a trust. Section 391 of the Restatement (Second) of Trusts provides: "Who Can Enforce a Charitable Trust.

"A suit can be maintained for the enforcement of a charitable trust by the [a]ttorney [g]eneral or other public officer, or by a co-trustee, or by a person who has a special interest in the enforcement of the charitable trust, but not by persons who have no special interest or by the settlor or his heirs, personal representatives or next of kin." Fiduciaries, such as trustees or cotrustees, have historically been deemed to have a "special interest" so as to possess standing. See *Hartford* v. *Larrabee Fund Assn.*, 161 Conn. 312, 288 A.2d 71 (1971) (declaratory action by trustee to determine constitutionality of special legislative act affecting terms of charitable trust). Still, the attorney general must be joined as a party to protect the public interest. General Statutes § 3-125; 2 Restatement (Second), supra, § 391. Those with no "special interest" have no standing to bring an action to enforce the conditions of the gift. These include persons within the general class of

(Internal quotation marks omitted.) *Smith* v. *Thompson,* supra, 169; see *Wier* v. *Howard Hughes Medical Institute,* supra, 1057; but see *McGee* v. *Vandeventer,* 326 Ill. 425, 441, 158 N.E. 127 (1927). On the basis of the weight of the foregoing authorities, we conclude that it is clear that the general rule at common law was that a donor had no standing to enforce the terms of a completed charitable gift unless the donor had expressly reserved a property interest in the gift.[5]

Having concluded that the plaintiff would have had no standing at common law, we now turn to its contention that the common law has been altered by the legislature's adoption of CUMIFA, specifically that portion codified at § 45a-533.[6] Subsection (a) of § 45a-533

beneficiaries of the charitable trust as well as members of the general public. See *Steeneck* v. *University of Bridgeport,* supra, 235 Conn. 588.

[5] By expressly reserving a property interest such as a right of reverter, the donor of the gift or the settlor of the trust may bring himself and his heirs within the "special interest" exception to the general rule that beneficiaries of a charitable trust may not bring an action to enforce the trust, but rather are represented exclusively by the attorney general. See *Steeneck* v. *University of Bridgeport,* supra, 235 Conn. 588, citing *Jones* v. *Grant,* 344 So. 2d 1210, 1212 (Ala. 1977) (adopting rule that "beneficiaries with a sufficient special interest in the enforcement of a charitable trust can institute a suit as to that trust"); *Hooker* v. *Edes Home,* 579 A.2d 608, 612–15 (D.C. App. 1990) (beneficiaries with "special interest" in charitable trust may bring action to enjoin breach of trust); *Young Men's Christian Assn. of Washington* v. *Covington,* 484 A.2d 589, 591 (D.C. App. 1984) (same).

[6] General Statutes § 45a-533 provides: "Release of restriction in gift instrument: Written consent, court order. Limitations. Doctrine of cy pres applicable. (a) With the written consent of the donor, the governing board may release, in whole or in part, a restriction imposed by the applicable gift instrument on the use or investment of an institutional fund.

"(b) If written consent of the donor cannot be obtained by reason of his death, disability, unavailability or impossibility of identification, the governing board may apply, in the name of the institution, to the Superior Court for a judicial district in which the institution conducts its affairs for release of a restriction imposed by the applicable gift instrument on the use or investment of an institutional fund. The Attorney General shall be notified of the application and shall be given an opportunity to be heard. If the court finds that the restriction is obsolete, inappropriate or impracticable, it may by order release the restriction in whole or in part. A release

empowers the governing board of an institution to seek a release of an onerous or obsolete restriction without resort to the courts by obtaining the donor's consent. Subsection (b) of § 45a-533 empowers the board to apply to the courts for such release in the event of the donor's death, disability or other unavailability.[7] Subsection (c) of § 45a-533 precludes the governing board from using a gift unburdened by a restriction for anything other than the "educational, religious, charitable or other eleemosynary purposes" of the institution. Subsection (d) of § 45a-533 confirms that the statute was not enacted to supplant but to supplement the doctrines of cy pres and approximation.[8]

The plaintiff bases its statutory standing claim primarily on the language of subsection (a) of § 45a-533, which provides that "[w]ith the written consent of the donor, the governing board may release, in whole or in part, a restriction imposed by the applicable gift instrument on the use or investment of an institutional fund." On the basis of this language, the Appellate Court

under this subsection may not change an endowment fund to a fund that is not an endowment fund.

"(c) A release under this section may not allow a fund to be used for purposes other than the educational, religious, charitable or other eleemosynary purposes of the institution affected.

"(d) This section does not limit the application of the doctrine of cy pres or approximation."

[7] When the donor is unavailable, under § 45a-533 (b), the governing board need only give notice to the attorney general, who operates to protect the public interest.

[8] "The rule of cy-pres is a rule for the construction of instruments in equity, by which the intention of the party is carried out *as near as may be*, when it would be impossible or illegal to give it literal effect. . . ." (Emphasis added.) Black's Law Dictionary (6th Ed. 1990) p. 387. The doctrine of cy pres may be applied without the consent of the donor. See 2 Restatement (Second), supra, § 399, comment (g).

The fact that the drafters of the Uniform Management of Institutional Funds Act and CUMIFA incorporated reference to the continued validity of the doctrine reflects that the provisions of CUMIFA were meant to supplement and not supplant cy pres.

concluded, and the plaintiff maintains, that "[i]t would be anomalous for a statute to provide for written consent by a donor to change a restriction and then deny that donor access to the courts to complain of a change without such consent." *Carl J. Herzog Foundation, Inc.* v. *University of Bridgeport,* supra, 41 Conn. App. 803. We disagree.

The plaintiff concedes, as it must, that nothing in the plain language of § 45a-533 (a) or any other portion of CUMIFA expressly provides statutory standing for donors to charitable institutions who have not somehow reserved a property interest in the gift such as a right of reverter. In order to demonstrate that the legislature intended to abrogate the common law, therefore, the plaintiff is left only with the legislative history of CUMIFA and the circumstances surrounding its enactment. The history and background of CUMIFA, however, not only do not support the plaintiff's claim of statutory standing; they directly refute it.

Faced with similar problems of statutory construction of CUMIFA provisions, we have stated that "[i]n the absence of prior authority to aid in the interpretation § 45a-527 (2) (B), we are guided by the meaning ascribed by its drafters to the parallel provision of the Uniform Management of Institutional Funds Act (UMIFA). *Griffin* v. *S. W. Devanney & Co.,* 775 P.2d 555, 559 (Colo. 1989); 2B J. Sutherland, Statutory Construction (5th Ed. 1992) § 52.05; see *DeLuca* v. *C. W. Blakeslee & Sons, Inc.,* 174 Conn. 535, 540–41, 391 A.2d 170 (1978)." *Yale University* v. *Blumenthal,* supra, 225 Conn. 37. In 1973, the Connecticut legislature adopted UMIFA. See Public Acts 1973, No. 73-548. "[I]t is manifest that the legislature in enacting CUMIFA intended to implement the intention, meaning and objectives of the commission that drafted UMIFA." *Yale University* v. *Blumenthal,* supra, 38. We agree with the defendant that the drafters of UMIFA did not intend to confer donor standing in

the matter of the release of gift restrictions, and that our legislature provided no indication when it enacted CUMIFA that it intended any other result.

First, it is unmistakable that the drafters of UMIFA regarded charitable institutions, particularly colleges and universities, as the principal beneficiaries of their efforts. The drafters set forth the explanation of their purpose in the prefatory note to UMIFA. "Over the past several years the governing boards of eleemosynary institutions, particularly colleges and universities, have sought to make more effective use of endowment and other investment funds. They and their counsel have wrestled with questions as to permissible investments, delegation of investment authority, and use of the total return concept in investing endowment funds. Studies of the legal authority and responsibility for the management of the funds of an institution have pointed up the uncertain state of the law in most jurisdictions. There is virtually no statutory law regarding trustees or governing boards of eleemosynary institutions, and case law is sparse. . . . One further problem regularly intruded upon the discussion of efforts to free trustees and managers from the alleged limitations on their powers to invest for growth and meet the financial needs of their institutions. Some gifts and grants contained restrictions on use of funds or selection of investments which imperiled the effective management of the fund. An expeditious means to modify obsolete restrictions seemed necessary." UMIFA, prefatory note, 7A U.L.A. 706 (1985).

UMIFA, drafted in the early 1970s, was set against the backdrop of a state of flux for colleges and universities. In a time of dramatic social change that cast new light on many older charitable gift restrictions, these institutions saw their operating costs rise significantly without a similar increase in endowment funds. W. Cary & C. Bright, The Law and Lore of Endowment

Funds (1969) p. 1. In the late 1960s, the Ford Foundation commissioned Professors Cary and Bright "to examine the legal restrictions on the powers of trustees and managers of colleges and universities to invest endowment funds to achieve growth, to maintain purchasing power, and to expend a prudent portion of appreciation in endowment funds." UMIFA, prefatory note, 7A U.L.A. 706 (1985). It is evident that the drafters of UMIFA paid heed to the concerns expressed in the Ford Foundation report as their final draft of UMIFA attempted to offer as much relief as possible *to charitable institutions*, without any mention of concern regarding a donor's ability to bring legal action to enforce a condition on a gift.

The specific area of relief to institutions focused upon by the Appellate Court and the plaintiff is that embodied in § 7, of UMIFA, entitled "Release of Restrictions on Use or Investment."[9] The prefatory note to that section provides: "It is established law that the donor may place restrictions on his largesse which the donee institution must honor. Too often, the restrictions on use or investment become outmoded or wasteful or unworkable. There is a need for review of obsolete restrictions and a way of modifying or adjusting them. The Act authorizes the governing board to obtain the acquiescence of the donor to a release of restrictions and, in the absence of the donor, to petition the appropriate court for relief in appropriate cases." Id., 709. In the comment to § 7, the drafters of UMIFA expressly provided that the donor of a completed gift would not have standing to enforce the terms of the gift. *"The donor has no right to enforce the restriction,* no interest in the fund and no power to change the eleemosynary beneficiary of the fund. He may only acquiesce in a lessening of a restriction already in effect." (Emphasis added.) UMIFA, § 7, comment, 7A U.L.A. 724 (1985).

---

[9] Section 7 of UMIFA is codified in CUMIFA at § 45a-533.

These clear comments regarding the power of a donor to enforce restrictions on a charitable gift arose in the context of debate concerning the creation of potential adverse tax consequences for donors, if UMIFA was interpreted to provide donors with control over their gift property after the completion of the gift. Pursuant to § 170 (a) of the Internal Revenue Code and § 1.170A-1 (c) of the Treasury Regulations, an income tax deduction for a charitable contribution is disallowed unless the taxpayer has permanently surrendered "dominion and control" over the property or funds in question. Where there is a possibility not "so remote as to be negligible" that the charitable gift subject to a condition might fail, the tax deduction is disallowed. See also I.R.C. § 2055; Treas. Reg. § 20.2055-2 (b) (similar provisions for estate tax deductions).

The drafters of UMIFA worked closely with an impressive group of professionals, including tax advisers, who were concerned with the federal tax implications of the proposed act.[10] The drafters' principal concern in this regard was that the matter of donor restrictions not affect the donor's charitable contribution deduction for the purposes of federal income taxation. In other words, the concern was that the donor not be so tethered to the charitable gift through the control of restrictions in the gift that the donor would not be entitled to claim a federal charitable contribution exemption for the gift. See I.R.C. § 170 (a); Treas. Reg. § 1.170A-1 (c).

In resolving these concerns, the drafters of UMIFA clearly stated their position in the commentary. "No federal tax problems for the donor are anticipated by permitting release of a restriction. *The donor has no right to enforce the restriction, no interest in the fund*

---

[10] Indeed, the drafters intent was to "track" the Internal Revenue Code as closely as possible. See Proceedings of the National Conference of Commissioners on Uniform State Laws, Uniform Management of Institutional Funds Act, (August 7, 1972) pp. 5, 7.

*and no power to change the eleemosynary beneficiary of the fund.* He may only acquiesce in a lessening of a restriction already in effect." (Emphasis added.) UMIFA, § 7, comment, 7A U.L.A. 724 (1985). The Appellate Court dismissed this language, reasoning that it is limited to "tax implications when a donor does consent in writing to a release of a restriction" and does not answer the question of whether the sole right to speak to the donor's interest in the release of a restriction "lies with the attorney general, to the exclusion of a donor." *Carl J. Herzog Foundation, Inc.* v. *University of Bridgeport,* supra, 41 Conn. App. 800. We disagree. Although the comments and the prefatory note to UMIFA do recognize that a donor has an interest in a restriction, as analyzed herein, we find no support in any source for the proposition that the drafters of either UMIFA or CUMIFA intended that a donor or his heirs would supplant the attorney general as the designated enforcer of the terms of completed and absolute charitable gifts.

Indeed, it would have been anomalous for the drafters of UMIFA to strive to assist charitable institutions by creating smoother procedural avenues for the release of restrictions while simultaneously establishing standing for a new class of litigants, donors, who would defeat this very purpose by virtue of the potential of lengthy and complicated litigation.[11]

There similarly is nothing in the history of our legislature's adoption of CUMIFA that contravenes the clear statement of the drafters of UMIFA that a "donor has

---

[11] The brief of the amici curiae in this appeal, the Connecticut Conference of Independent Colleges, Inc., the Connecticut Association of Independent Schools, Inc., and the National Association of Independent Colleges and Universities persuasively posits that, should the establishment of donor standing become the law, the infinite variety of charitable gift restrictions that affect educational institutions would create the potential for a flood of "time-consuming, fact-sensitive litigation." This "mischief," they argue, would harm the very institutions that the CUMIFA intended to protect. We agree.

no right to enforce [a] restriction . . . ." UMIFA, § 7, comment, 7A U.L.A. 724 (1985). It is clear that our legislature knows how to establish statutory standing and it has done so unambiguously in a plethora of instances. See, e.g., General Statutes § 42-110g (a) (private cause of action based on violation of Connecticut Unfair Trade Practices Act); General Statutes § 46a-99 (persons aggrieved by violations of antidiscrimination statute "may petition the Superior Court for appropriate relief").

Finally, the legislative history of CUMIFA indicates that the legislature was aware of the question of donor standing regarding restrictions, but chose not to establish it. During the legislative debate regarding House Bill No. 8268, Representative James T. Healey stated, "if the donor has seen fit to spell out restrictions, then those restrictions govern. This bill steps in only in the event that he has not spelled out the restrictions." 16 H.R. Proc., Pt. 11, 1973 Sess., p. 5732. Representative David Neiditz added that "the bill generally leaves it to the donor to make his own provisions for the matters covered in the bill. The bill applies when the donor has not specified another way." Id., p. 5726.

On the basis of our careful review of the statute itself, its legislative history, the circumstances surrounding its enactment, the policy it was intended to implement, and similar common-law principles governing the same subject matter, we conclude that CUMIFA does not establish a new class of litigants, namely donors, who can enforce an unreserved restriction in a completed charitable gift. Nothing in our review supports the conclusion that the legislature, in enacting CUMIFA, implicitly intended to confer standing on donors.

The judgment of the Appellate Court is reversed and the case is remanded to that court with direction to affirm the judgment of the trial court.

In this opinion BORDEN and PALMER, Js., concurred.

MCDONALD, J., with whom BERDON, J., joins, dissenting. I would affirm the thoughtful and well reasoned opinion of the Appellate Court. *Carl J. Herzog Foundation, Inc.* v. *University of Bridgeport*, 41 Conn. App. 790, 677 A.2d 1378 (1996).

The majority here holds that the donor itself may not enforce a restriction in a gift to an educational institution when the institution had specifically agreed to that restriction. This decision is simply an approval of a donee, in the words of the donor, "double crossing the donor," and doing it with impunity unless an elected attorney general does something about it.

This decision will not encourage donations to Connecticut colleges and universities. I fail to see why Connecticut, the home of so many respected schools that would honor their promises, should endorse such sharp practices and create a climate in this state that will have a chilling effect on gifts to its educational institutions.

Accordingly, I respectfully dissent.