[723 NYS2d 426]

Adele Smithers, Appellant, v St. Luke's-Roosevelt Hospital Center et al., Respondents.

First Department, April 5, 2001

APPEARANCES OF COUNSEL

*Paul R. Levenson* of counsel (*August C. Venturini, Andrew B. Siben* and *Frederick Fagelson* on the brief; *Kaplan Gottbetter & Levenson, L. L. P.,* and *Siben & Siben*), attorneys for appellant.

*Edward S. Kornreich* of counsel (*Charlès S. Sims, Leonard A. Feiwus* and *Herschel Goldfield* on the brief; *Proskauer Rose, L. L. P.,* attorneys), for St. Luke's-Roosevelt Hospital Center and another, respondents.

*William Josephson* of counsel (*Peter H. Schiff, Dietrich Snell* and *Paula Gellman* on the brief; *Eliot Spitzer, Attorney General* of New York State, attorney), for Dennis C. Vacco, respondent.

## OPINION OF THE COURT

ELLERIN, J.

The issue before us is whether the estate of the donor of a charitable gift has standing to sue the donee to enforce the terms of the gift. We conclude that in the circumstances here present plaintiff estate does have the necessary standing.

A recitation of the factual allegations in the complaint, which must be deemed true on this application to dismiss (*see, e.g., Cron v Hargro Fabrics*, 91 NY2d 362), is instructive. Plaintiff Adele Smithers is the widow of R. Brinkley Smithers, a recovered alcoholic who devoted the last 40 years of his life to the treatment and understanding of the disease of alcoholism. In 1971 Smithers announced his intention to make a gift to defendant St. Luke's-Roosevelt Hospital Center (the Hospital) of $10 million over time for the establishment of an alcoholism treatment center (the Gift). In his June 16, 1971 letter to the Hospital creating the Gift, Smithers stated, "Money from the $10 million grant will be supplied as needed. It is understood, however, that the detailed project plans and staff appointments must have my approval."

According to the complaint, the Hospital agreed to use the Gift to expand its treatment of alcoholism to include, following five days of detoxification in the hospital, "rehabilitation in a free-standing, controlled, uplifting and non-hospital environment," that is, a "therapeutic community" removed from the hospital setting. With $1 million from the first installment of the Gift, the Hospital purchased a building at 56 East 93rd Street in Manhattan to house the rehabilitation program, and in 1973 the Smithers Alcoholism Treatment and Training Center opened there.

Smithers thereafter remained involved in the management and affairs of the Smithers Center. At times, according to the complaint, the Hospital sought to avoid its obligations under the terms of the Gift, and its relationship with Smithers was an uneasy one. On July 31, 1978, Smithers wrote that the Hospital had "not lived up to my letter of intent," and that "[u]nder the circumstances no funds or stock will be forthcoming from me." Only slightly more than half of the Gift had been made at that time.

In 1981 the president of the Hospital, Gary Gambuti, commenced discussions with Smithers in an effort to induce him to complete the Gift. In a November 5, 1981, letter, Smithers informed Gambuti that he had no objection to the sale of the building. Smithers noted in the letter that when the Smithers rehabilitation facility was set up there was practically no place in the New York area for an alcoholic to undergo rehabilitation after detoxification, but now there are a number of facilities, most of which "have the advantage of being at least a few miles out of town—so there is more chance of outdoor recreation." According to Mrs. Smithers, her husband had no intention of completing the Gift, but agreed to the sale of the building to keep the Smithers Center afloat. In any event, Gambuti, in response, assured Smithers of the Hospital's continuing interest in the Smithers Alcoholism Program and its commitment to expanding its entire alcoholism treatment program. He wrote that he saw no reason to sell the building until a plan for this program had been proposed, and that he would appreciate receiving Smithers's comments and suggestions before the plan was finalized. He expressed his hope that Smithers would be willing "to sit down with us and review our proposals for the future expansion in alcoholism." Contrary to the dissent's categorical conclusion that this appeal concerns merely the sale of the building, expressly agreed to by Smithers, that consent was given before the Gift's completion and must be viewed in the context of what follows.

Over the next two years, Gambuti repeatedly assured Smithers that the Hospital would strictly adhere to the terms of the Gift and carry out Smithers's intent in making it. Only when Smithers was completely satisfied of the Hospital's intentions did he agree to complete the Gift, which he accomplished in an October 24, 1983 letter, stating:

> "Thanks to the cooperation of the officers and staff
> of the Smithers Center and St. Luke's-Roosevelt

Hospital Center (the 'Hospital'), the Smithers Center is now in splendid shape, and I feel that the time has come for me to complete the funding of the project. (*In this letter I will refer to all aspects of the existing alcoholism program, including in-patient, out-patient and rehabilitation services, and any future extension thereof, collectively as the 'Smithers Center'*). * * *

"This final contribution is subject to the following restrictions and is to be used exclusively for the following purposes.

"First, it is my intention that my final contribution be set aside as an endowment fund, (the 'Smithers Endowment Fund'). The income is to be used exclusively for the support of the Smithers Center, to the extent necessary for current operations, and any unused income remaining at the end of each calendar year is to be accumulated and added to principal. Principal of the Smithers Endowment Fund is not to be expended for any purpose except for remodeling or rebuilding the administration section and out-patient floor at the Building on 58th Street, and for construction, repairs or improve-ments with respect to any other building space at any time used directly in connection with the Smithers Center. Such capital expenditures should be considered as secondary to the endowment func-tion and should in no event exceed in the aggregate one half of the initial value of the Smithers Endow-ment Fund." (Emphasis added.)

Beneath Smithers's signature is the following paragraph signed and dated by Gambuti:

"The contribution of the number of shares of IBM Stock referred to above by R. Brinkley Smithers is gratefully accepted, *subject to the restrictions set forth in this letter*, in full satisfaction of any outstanding pledge or other obligation." (Emphasis added.)

The existing rehabilitation services, which Smithers included in his definition of the Smithers Center and which the Hospital's acceptance of the Gift encompassed, were housed in the free-standing Smithers building and, according to the com-plaint, were intended always to be housed in *a* free-standing facility.

In late 1992, the Hospital asked Mrs. Smithers to organize a "Silver Anniversary Gala," in honor of her husband and herself, to raise funds for restoration of the building and for a scholarship program for Smithers Center patients in need of financial assistance. From 1992 to March 1995, she and, until his death in January 1994, Smithers worked to organize the event, securing pledges for millions of dollars' worth of donated goods and services. The event was scheduled for April 1995. Then, in March 1995, just over a year after Smithers's death, the Hospital announced that it planned to move the Smithers Center into a hospital ward and sell the East 93rd Street building. The Hospital directed Mrs. Smithers, a month and a half before the fundraiser was scheduled to be held, to cancel the event.

The Hospital's announced intentions aroused Mrs. Smithers's suspicions. First, relocating the patients in a hospital ward would violate the Hospital's obligation to run the Smithers Center in a free-standing facility physically separate from the Hospital. Second, the Hospital's claim that it had to sell the building to become more competitive was inconsistent with its assurances to her husband and her through the years that the Smithers Center was operating at a profit. Mrs. Smithers notified the Hospital of her objections to the proposed relocation of the program and demanded an accounting of the Smithers Center's finances.

The Hospital at first resisted disclosing its financial records, but Mrs. Smithers persisted, and in May 1995 the Hospital disclosed that it had been misappropriating monies from the Endowment Fund since before Smithers's death, transferring such monies to its general fund where they were used for purposes unrelated to the Smithers Center. Mrs. Smithers notified the Attorney General, who investigated the Hospital's plan to sell the building and discovered that the Hospital had transferred restricted assets from the Smithers Endowment Fund to its general fund in what it called "loans." The Attorney General demanded the return of these assets and in August 1995 the Hospital returned nearly $5 million to the Smithers Endowment Fund, although it did not restore the income lost on those funds during the intervening years.

In the next three years, Mrs. Smithers tried to negotiate a resolution with the Hospital. The Attorney General participated in the negotiations, seeking, according to an affidavit in support of his motion to dismiss the complaint, "to effectuate a settlement that would resolve the plaintiff's concerns and ben-

efit the Smithers Alcoholism Program." When the negotiations proved unsuccessful, the Attorney General, according to the affidavit, "proceeded to conclude his investigation * * * and to resolve those issues identified during the course of the investigation." On April 21, 1998, the Attorney General, having received a letter from an attorney writing on behalf of Mrs. Smithers, wrote to counsel for the Hospital advising that he would not object to the sale of the East 93rd Street building "so long as the Hospital can demonstrate * * * to our satisfaction," *inter alia*, that the Hospital's plan for the Smithers program and the Smithers Center would continue "in accordance with the donor's gift," that the Hospital would disclose to the Attorney General any changes to the Smithers program budget resulting from "the proposed relocation of the inpatient rehabilitation unit from the East 93rd Street building to the Hospital," and that safeguards had been put into place to prevent future commingling of restricted funds. The letter stated that the Attorney General would require an assurance that no such commingling of funds would occur in the future.

In July 1998, the Attorney General entered into an Assurance of Discontinuance pursuant to Executive Law § 63 (15) with the Hospital. Under the terms of this assurance the Hospital agreed to make no more transfers or loans from Gift funds for any purpose other than the benefit of the Smithers Center and to return to the Gift fund $1 million from the proceeds of any sale of the building. The Attorney General did not require the Hospital to return the entire proceeds of such a sale, because he found that, contrary to Mrs. Smithers's contention, the terms of the Gift did not preclude the Hospital from selling the building.

Two months later, Mrs. Smithers commenced this suit to enforce the conditions of the Gift and to obtain an accounting by the Hospital of its handling of the Endowment Fund and property dedicated to the Smithers Center. The Hospital and the Attorney General were named, *inter alia*, as defendants. Mrs. Smithers had obtained Special Letters of Administration from the Nassau County Surrogate's Court appointing her the Special Administratrix of Smithers's estate for the purpose of pursuing claims by the estate against the Hospital in connection with its administration of the Smithers Center. The named executor of Smithers's estate had consented to the issuance of the Special Letters of Administration. The Attorney General had appeared before the Surrogate on behalf of ultimate charitable beneficiaries. The Surrogate issued the letters "upon the

understanding that the Court takes no position with regard to the advisability of any contemplated litigation."

Mrs. Smithers sought an injunction to permanently enjoin the Hospital from selling the building and relocating the Smithers Center without court approval, for specific performance by the Hospital of the terms of the Gift, e.g., perpetual maintenance of a free-standing rehabilitation unit and return to the Gift funds of all proceeds of any sale or rental of the building, for return of all income lost on the funds misappropriated by the Hospital from the Gift funds, for imposition of a constructive trust, for an accounting, and for a judicial declaration concerning the terms and conditions under which the Gift fund is to be administered. She then moved for a preliminary injunction against the sale of the building by the Hospital. The Hospital moved to strike a notice of pendency that Mrs. Smithers had filed against the building and moved to dismiss the complaint for lack of standing. The Attorney General also moved to dismiss for lack of standing and for failure to state a cause of action. Supreme Court denied the motion for a preliminary injunction, granted the motions to dismiss, and canceled the notice of pendency on the building. Mrs. Smithers then moved this Court for a preliminary injunction pending appeal to prevent the sale of the building or, alternatively, to enjoin disbursement of the proceeds in the event of a sale. We granted the motion to enjoin disbursement of the sale proceeds and directed that the proceeds be placed in escrow pending our further order.

On appeal, the Attorney General's office, having reevaluated the matter "under the direction of the newly elected Attorney General," reversed its position and urged this Court to remand for a hearing on the merits to determine whether or not the building was subject to Gift restrictions. If it were, then all proceeds of the sale would be subject to the same restrictions and could not be used for the Hospital's general purposes. The Attorney General was constrained to point out that, in that case, the Assurance of Discontinuance could not authorize the sale of the building and the application of only $1 million of the sale proceeds to the Smithers Center in the absence of the donor's release of the restrictions or a court order authorizing the release of the restrictions. He explained that he had supported Mrs. Smithers's motion before this Court for a preliminary injunction against the sale of the building because he agreed that a hearing was required to determine whether such restrictions existed. However, the Attorney General urged that

the issue of Mrs. Smithers's standing to bring the suit need not, and should not, be reached in this action, since he certainly had standing and had joined with her in seeking reversal and remand.

We note that, not only did the Hospital (and the Attorney General) fail to seek court approval of the Assurance of Discontinuance, which was required by section 522 of the Not-For-Profit Corporation Law because the Assurance contemplated the sale of the building, the diversion of all the appreciation realized upon the sale, and the relocation of the rehabilitation unit out of a free-standing, non-hospital environment and into a hospital ward, all of which may have been contrary to the terms of the Gift (see, Alco Gravure v Knapp Found., 64 NY2d 458), but also, just before signing the Assurance of Discontinuance, the Hospital had closed the in-hospital detox unit without even informing the Attorney General. The Attorney General learned of the closing a few months later from Mrs. Smithers's papers on her motion for a preliminary injunction. In his reply memorandum of law in support of the motion to dismiss, the Attorney General argued that he had not abdicated his duty by failing to prevent the closing, but had "reasonably relied on a specific representation" made by the executive vice president of the Hospital's corporate parent that the Smithers Alcoholism Center would remain at the Hospital, and that the Hospital had not advised the Attorney General of its actions "in breach of that representation." It may be observed that it was only Mrs. Smithers's vigilance that brought this to light, since apparently the Attorney General had no procedure in place by which to insure compliance by the donee. Appropriate oversight undoubtedly would have been provided had the requisite court approval been sought as statutorily required.

While this appeal was pending, the Attorney General and the Hospital reached another agreement. This agreement raised some issues for the first time, but it brought the position of the Attorney General and the Hospital on other issues into accord with Mrs. Smithers's position. For example, the Hospital agreed to allocate the entire net proceeds of the sale of the building to the restricted purposes of the Gift and to restore the income lost as a result of the transfer of Gift funds to its general fund. Reversing his position again, the Attorney General returned to his predecessor's contention that Mrs. Smithers has no standing to bring this suit, and asked this Court to modify the decision dismissing the complaint for lack of standing so as to hold only that plaintiff does not have stand-

ing as special administratrix of the donor's estate and affirm, as modified, on that narrow ground. He sought a remand of the matter, not for further proceedings on the merits, but for the court's approval and implementation of his settlement stipulation with the Hospital.

The sole issue before us is whether Mrs. Smithers, on behalf of Smithers's estate, has standing to bring this action. The Attorney General maintains that, with a few exceptions inapplicable here, standing to enforce the terms of a charitable gift is limited to the Attorney General. Most recently, the Attorney General has urged that, pursuant to the above-mentioned proposed settlement stipulation between himself and the Hospital, he has achieved all the relief that is appropriate in this case.

We begin by acknowledging that, pursuant to article 8 of the Estates, Powers and Trusts Law governing the disposition of property for charitable purposes, "[t]he Attorney General shall represent the beneficiaries of such dispositions for religious, charitable, educational or benevolent purposes and it shall be his duty to enforce the rights of such beneficiaries by appropriate proceedings in the courts" (EPTL 8-1.1 [f]). By designating the Attorney General as the representative of undesignated beneficiaries, the Legislature provided a mechanism for enforcing charitable trusts, which for a time had been deemed invalid in New York State because they lacked certain beneficiaries who could claim their enforcement (*Lefkowitz v Lebensfeld*, 51 NY2d 442, 446). However, while EPTL 8-1.1 (f) expressly extended the Attorney General's enforcement powers to all charitable dispositions, including absolute gifts, case law had already recognized the Attorney General's power to insure that charities used absolute gifts in accordance with the donors' stated purposes (*id.*, citing *St. Joseph's Hosp. v Bennett*, 281 NY 115, 119). In *St. Joseph's*, a charitable corporation that operated a hospital had obtained a declaratory judgment, over the Attorney General's opposition, that the testator's bequest for an endowment fund did not create a trust but was an absolute gift and as such need not be maintained intact as an endowment fund. The Court of Appeals held that whether the clearly expressed direction of a testator must be obeyed did not depend upon whether the gift was absolute or created a trust.

> "The authorities sustain the validity of the direction of the testator, and equity will afford protection to a donor to a charitable corporation in that the Attorney-General may maintain a suit to

compel the property to be held for the charitable purpose for which it was given to the corporation. * * * Nothing in authority, statute or public policy has been brought to our attention which prevents a testator from leaving his money to a charitable corporation and having his clearly expressed intention enforced" (281 NY at 119).

The question of whether the donor who is living and can maintain his or her own action need rely on the protection of the Attorney General to enforce the terms of his gift was not before the Court in either *Lebensfeld* or *St. Joseph's*. This question was addressed in *Associate Alumni of Gen. Theological Seminary v General Theological Seminary* (163 NY 417). Alumni of a seminary had contributed money for the endowment of a professorship, on certain specified conditions, retaining the right of nomination when the chair became vacant. When disputes arose concerning those conditions, the voluntary association of alumni formed a corporation and brought an action against the seminary. The matter was submitted upon an agreed statement of facts to the Appellate Division, which found that the corporation had standing to bring suit as successor in rights and interest of the voluntary association of alumni, the donor of the fund, and that the seminary had received the fund in trust and had breached the terms of the trust. The court directed the seminary to transfer the fund to the corporation.

The Court of Appeals affirmed the Appellate Division's determination of the rights of the respective parties, but modified the judgment to decree specific performance by the seminary of the terms of the trust, instead of directing the return of the fund to the corporation. In the event of failure to comply with the judgment, the fund would be surrendered to the court or trustees appointed by the court, after which the corporation could apply to the court for disposition of the fund.

"The general rule is 'If the trustees of a charity abuse the trust, misemploy the charity fund, or commit a breach of the trust, the property does not revert to the heir or legal representative of the donor unless there is an express condition of the gift that it shall revert to the donor or his heirs, in case the trust is abused, but the redress is by bill or information by the attorney-general *or other person having the right to sue.*' (2 Perry on Trusts, sec. 744; *Sanderson* v. *White,* 18 Pickering, 328;

*Vidal* v. *Girard's Executors,* 2 Howard [U.S.], 191; *Mills* v. *Davison,* 54 N. J. Eq. 659.) The judgment below practically abrogates the trust and restores the fund to the plaintiff. To such return the plaintiff was not entitled, though as donor and possessor of the right to nominate to the professorship, it had sufficient standing to maintain an action to enforce the trust. (*Mills* v. *Davison, supra.*)" (163 NY at 422; emphasis added.)

In dismissing Mrs. Smithers's complaint, Supreme Court relied on *Associate Alumni (supra)* and *Alco Gravure v Knapp Found.* (64 NY2d 458) to hold that, since the Gift instruments do not provide Mrs. Smithers with the right of oversight, that right is vested exclusively in the Attorney General and Mrs. Smithers has no standing to sue. However, neither *Associate Alumni* nor *Alco Gravure* mandates this result. The holding of the former that the donor alumni association had standing to enforce its gift explicitly forecloses the conclusion that the Attorney General's standing in these actions is exclusive. At the same time, the Court's characterization of the association as "donor and possessor of the right to nominate to the professorship" does not necessitate the conclusion that no donor has standing without having retained such a right. In the case on which the Court relied for its holding of donor standing, the donor had not retained any rights, but, "as the founder of the charity, has a standing to appear in court to restrain the diversion of the property donated from the charitable uses for which it was given" (*Mills v Davison,* 54 NJ Eq 659, 667 35 A 1072, 1075).

The dissent relies heavily on an observation of the Court in *Alco Gravure* that, "[n]ormally, standing to challenge actions by the trustees of a charitable trust or corporation is limited to the Attorney-General" (64 NY2d at 466). However, this observation was only an incomplete recapitulation of the general rule cited in full earlier in the opinion, that "one who is merely a possible beneficiary of a charitable trust, or a member of a class of possible beneficiaries, is not entitled to sue for enforcement of the trust [citations omitted]. Instead, the Attorney-General has the statutory power and duty to represent the beneficiaries of any disposition for charitable purposes (EPTL 8-1.1[f] [additional citations omitted])" (64 NY2d at 465). The rule does not designate the Attorney General as the exclusive representative of donors of charitable dispositions, and the Court in *Alco Gravure* was not addressing the issue of

donor standing. The issue was the standing of a certain group of beneficiaries. The Court held that the section of the Not-For-Profit Corporation Law that permits amendment of the certificate of incorporation of a charitable corporation does not authorize an amendment inconsistent with the purposes for which the funds were given to the corporation without compliance with the quasi-cy pres principles incorporated in the law, and that this particular group of beneficiaries of the charitable corporation had standing to oppose the amendment. The Court found that the group, which was comprised of beneficiaries who were entitled to a preference in the distribution of the charitable funds, was sharply defined and limited in number and, as such, constituted an exception to the general rule. Moreover, the policy reason for limiting standing—"to prevent vexatious litigation and suits by irresponsible parties who do not have a tangible stake in the matter and have not conducted appropriate investigations" (64 NY2d at 466)—was not applicable in this case. The plaintiffs' tangible stake in the matter derived from their status as preferred beneficiaries of the funds, which status would have been completely eliminated by the dissolution of the charitable corporation.

Supreme Court incorrectly characterized Mrs. Smithers as one who "positions herself as the champion and representative of the possible beneficiaries of the Gift," with no tangible stake because she has no position or property to lose if the Hospital alters its administration of the Gift. Mrs. Smithers did not bring this action on her own behalf or on behalf of beneficiaries of the Smithers Center. She brought it as the court-appointed special administratrix of the estate of her late husband to enforce his rights under his agreement with the Hospital through specific performance of that agreement. Therefore, the general rule barring beneficiaries from suing charitable corporations has no application to Mrs. Smithers. Moreover, the desire to prevent vexatious litigation by "irresponsible parties who do not have a tangible stake in the matter and have not conducted appropriate investigations" has no application to Mrs. Smithers either. Without possibility of pecuniary gain for himself or herself, only a plaintiff with a genuine interest in enforcing the terms of a gift will trouble to investigate and bring this type of action. Indeed, it was Mrs. Smithers's accountants who discovered and informed the Attorney General of the Hospital's misdirection of Gift funds, and it was only after Mrs. Smithers brought her suit that the Attorney General acted to prevent the Hospital from diverting the entire proceeds

of the sale of the building away from the Gift fund and into its general fund. The Attorney General, following his initial investigation of the Hospital's administration of the Gift, acquiesced in the Hospital's sale of the building, its diversion of the appreciation realized on the sale, and its relocation of the rehabilitation unit, even as he ostensibly was demanding that the Hospital continue to act "in accordance with the donor's gift" (*see* April 21, 1998 letter, *supra*). Absent Mrs. Smithers's vigilance, the Attorney General would have resolved the matter between himself and the Hospital in that manner and without seeking permission of any court.

The donor of a charitable gift is in a better position than the Attorney General to be vigilant and, if he or she is so inclined, to enforce his or her own intent. Smithers was the founding donor of the Smithers Center, which he established to carry out his vision of "first class alcoholism treatment and training." In his agreement with the Hospital he reserved to himself the right to veto the Hospital's project plans and staff appointments for the Smithers Center. He and Mrs. Smithers remained actively involved in the affairs of the Smithers Center until his death, and she thereafter. During his lifetime, when Smithers found that, as he wrote on July 31, 1978, "[c]ertain things that were definitely understood were not carried out" by the Hospital, he decided not to donate the balance of the Gift. It was only when the Hospital expressly agreed to the various restrictions imposed by Smithers that he completed the Gift. The Hospital's subsequent unauthorized deviation from the terms of the completed Gift commenced during Smithers's lifetime and was discovered shortly after he died. To hold that, in her capacity as her late husband's representative, Mrs. Smithers has no standing to institute an action to enforce the terms of the Gift is to contravene the well-settled principle that a donor's expressed intent is entitled to protection (*see St. Joseph's, supra; Lefkowitz v Lebensfeld, supra; Alco Gravure, supra*) and the longstanding recognition under New York law of standing for a donor such as Smithers (*see Associate Alumni, supra*). We have seen no New York case in which a donor attempting to enforce the terms of his charitable gift was denied standing to do so. Neither the donor nor his estate was before the court in any of the cases urged on us in opposition to donor standing (*see, e.g., Alco Gravure, supra; Stewart v Franchetti*, 167 App Div 541; *Matter of De Long*, 169 AD2d 1005, *lv denied* 77 NY2d 809; *Lefkowitz v Lebensfeld*, 68 AD2d 488, *affd* 51 NY2d 442). The courts in these cases were not addressing the

situation in which the donor was still living or his estate still existed. (*Cf., Herzog Found. v University of Bridgeport*, 243 Conn 1, 699 A2d 995.)

Moreover, the circumstances of this case demonstrate the need for co-existent standing for the Attorney General and the donor. The Attorney General's office was notified of the Hospital's misappropriation of funds by Mrs. Smithers, whose accountants performed the preliminary review of the Hospital's financial records, and it learned of the Hospital's closing of the detox unit—a breach, according to the Attorney General, of a specific representation—from Mrs. Smithers's papers in this action. Indeed, there is no substitute for a donor, who has a "special, personal interest in the enforcement of the gift restriction" (Note, *Protecting the Charitable Investor: A Rationale for Donor Enforcement of Restricted Gifts*, 8 BU Pub Int LJ 361, 380 [1999]). Mrs. Smithers herself, who the Supreme Court found had no position to lose if the Hospital altered its administration of the Gift, has her own special, personal interest in the enforcement of the Gift restrictions imposed by her husband, as is manifest from her own fundraising work on behalf of the Smithers Center and the fact that the gala that she organized and that the Hospital ultimately cancelled was to be in her honor as well as her husband's. In any event, the Attorney General's interest in enforcing gift terms is not necessarily congruent with that of the donor. The donor seeks to have his or her intent faithfully executed, which by definition will benefit the beneficiaries, and perhaps also to erect a tangible memorial to himself or herself. In the June 16, 1971 letter to the Hospital in which Smithers created the Gift, he wrote that it "is to be used to set up the Smithers Alcoholism Treatment and Training Center." As the Court of Appeals has observed, a donor's desire to perpetuate his name as a benefactor of a particular charitable institution and humankind is not a selfish one (*Matter of Scott*, 8 NY2d 419, 427). "These desires are deeply ingrained in human nature and are effective motivating forces in donations of this character" (*id.* at 428). Perpetuating the donor's good name is certainly also a profound concern of his or her estate. We conclude that the distinct but related interests of the donor and the Attorney General are best served by continuing to accord standing to donors to enforce the terms of their own gifts concurrent with the Attorney General's standing to enforce such gifts on behalf of the beneficiaries thereof.

Mrs. Smithers, appointed the Special Administratrix of Smithers's estate for the purpose of pursuing claims by the

estate against the Hospital in connection with its administration of the Smithers Center, therefore has standing to sue the Hospital for enforcement of the Gift terms (EPTL 11-1.1 [b] [13]; *see, Matter of Rappaport*, 102 Misc 2d 910).

Since we hold that the common law of the State of New York permits Mrs. Smithers to bring this action, we need not reach the issue of whether N-PCL 522 authorizes it.

Accordingly, the order of the Supreme Court, New York County (Beatrice Shainswit, J.), entered December 18, 1998, which, *inter alia*, denied plaintiff's motion for a preliminary injunction and granted the motions of defendants St. Luke's-Roosevelt Hospital Center and the Attorney General to dismiss the complaint, should be modified, on the law, to grant plaintiff's motion for a preliminary injunction to the extent of staying disbursement of the proceeds of the sale of the East 93rd Street building, to deny defendants' motion to dismiss the complaint and to reinstate the complaint, and otherwise affirmed, without costs.

FRIEDMAN, J. (dissenting). This appeal has its origins in a $10,000,000 gift made by R. Brinkley Smithers to defendant St. Luke's-Roosevelt Hospital Center for the creation of an alcoholism treatment program. Mr. Smithers began funding the gift in 1971 and, soon thereafter, in accordance with his desire to establish a free-standing alcohol treatment center, the hospital purchased a building at 56 East 93rd Street in Manhattan for $1,000,000. The building was to provide a non-hospital setting for the rehabilitation portion of the treatment program.

As the majority aptly notes, the relationship between Mr. Smithers and the hospital was at times strained. Yet, like the loving parent of an errant child, Mr. Smithers resolved his disputes with the hospital and kept contributing over the course of a relationship spanning 23 years, notwithstanding the hospital's failure to honor some of his wishes and its use of funds for other than anticipated purposes.

Regardless of any disagreements between the hospital and Mr. Smithers, by 1981, Mr. Smithers agreed that changing conditions meant that the sale of the East 93rd Street building was warranted. Hence, in a letter dated November 5, 1981 to Gary Gambuti, president of the hospital, Mr. Smithers approved of the sale of the building because he recognized that a free-standing alcoholism treatment center had become obsolete. Actually, Mr. Smithers did more than approve of the sale of

the building, he appears to have had a role in seeking a buyer, stating in his letter:

"I got a call today from [a broker] * * * She claims that she * * * will pay $3,000,000 cash for the building.

"I know how hard up St. Luke's-Roosevelt Hospital is and I have no objection to the sale of the building.

"When the Smithers Rehabilitation was set up, there was practically no place to send an alcoholic after detoxification for rehabilitation in the New York area. There are now quite a few facilities and most of them have the advantage of being at least a few miles out of town so there is more chance of outdoor recreation."

Notwithstanding Mr. Smithers's agreement, the hospital decided not to sell at that time.

Mr. Smithers's understanding that the sale of the East 93rd Street building was inevitable is also evidenced by his letter dated October 24, 1983 to Gambuti. In that letter, Mr. Smithers set forth that he was completing the $10,000,000 pledge made in 1971 and that he wanted an endowment established. Significantly, and as the majority apparently recognizes, in discussing permitted uses of the endowment, no mention is made of the East 93rd Street building but only of one on East 58th Street.

In 1994 Mr. Smithers passed away. About a year later, the hospital decided that it wished to do that which Mr. Smithers had previously agreed to in 1981, that is, to sell the East 93rd Street building, for which there was now a purchaser willing to pay approximately $15,000,000. The hospital planned to relocate the rehabilitation portion of the program to its main complex after the sale of the building.

Mr. Smithers's wife, Adele Smithers, the plaintiff in this action, learned of the proposed sale in March 1995, when the president of the hospital called her in order to cancel a fundraising event that she had been organizing for two years. The event, which was to be held in her honor as well as that of her deceased husband, aimed to raise funds to enhance the East 93rd Street building.

A complaint by Mrs. Smithers to the Attorney General soon followed, leading to an extensive investigation of the hospital's

use of the Smithers gift. Ultimately the Attorney General determined that the proposed sale of the building would not violate the terms of the gift. Pursuant to an Assurance of Discontinuance issued by the Attorney General (see, Executive Law § 63 [15]), the hospital could sell the building, provided it retained a portion of the proceeds for the exclusive use of the treatment program.

Dissatisfied with the results of the Attorney General's investigation, Adele Smithers obtained an order appointing her the special administratrix of her husband's estate and in that capacity commenced this action against the hospital and the Attorney General. The action sought, inter alia, an accounting of gift funds, an order directing the hospital to conform to the terms of the gift, and an order precluding it from selling the East 93rd Street building. In prosecuting the action, Mrs. Smithers candidly acknowledged that neither she nor the estate had any continuing financial interest in, or right to exercise any control over, the gift. Supreme Court dismissed the complaint, finding that plaintiff lacked standing to prosecute the action. This appeal followed.

During the pendency of this appeal, it is uncontroverted that the hospital and the Attorney General entered into a stipulation superceding the previously issued Assurance of Discontinuance. This new stipulation provided for the hospital to dedicate the entire net proceeds arising from the $15,000,000 sale of the building to the Smithers Endowment Fund for the treatment of substance abuse, and addressed virtually all of the concerns initially voiced by plaintiff. Notwithstanding this, plaintiff continued to voice objection to the settlement apparently because it permitted the East 93rd Street building to be sold and allowed the hospital to use the funds not just for the treatment of alcohol addiction but also for the treatment of other addictions.

On this appeal, both the hospital and the Attorney General assert that Adele Smithers's complaint must be dismissed because she lacks standing. The emergent issue, therefore, is whether Adele Smithers, as the representative of her husband's estate, has standing to bring this action seeking to enforce the terms of a charitable gift given by her husband, the funding of which was completed approximately 12 years before this action was commenced. Because I believe that plaintiff does not have standing, I respectfully dissent.

In considering the subject of standing, I begin with the observation that, when a charitable gift is made, without any

provision for a reversion of the gift to the donor or his heirs, the interest of the donor and his heirs is permanently excluded (*see, Associate Alumni of Gen. Theological Seminary v General Theological Seminary*, 163 NY 417, 422; *Stewart v Franchetti*, 167 App Div 541, 547). Accordingly, in the absence of a right of reverter, the right to seek enforcement of the terms of a charitable gift is restricted to the Attorney General (*see, Alco Gravure v Knapp Found.*, 64 NY2d 458, 466; *Matter of De Long*, 169 AD2d 1005, 1006, *lv denied* 77 NY2d 809; *Lefkowitz v Lebensfeld*, 68 AD2d 488, 495, *affd* 51 NY2d 442; *Stewart v Franchetti*, *supra*; *see also, Herzog Found. v University of Bridgeport*, 243 Conn 1, 699 A2d 995 [Sup Ct 1997]). As unequivocally stated by the Court of Appeals in *Alco Gravure v Knapp Found.* (*supra*, at 466), the general rule is that "standing to challenge actions by the trustees of a charitable trust or corporation is limited to the Attorney-General."

The majority seeks to avoid the impact of this general rule, pointing out that the issue the Court was addressing in *Alco Gravure* was not whether a donor had standing but whether a certain group of beneficiaries had standing. While that may be an accurate observation concerning the facts in *Alco Gravure*, it does not diminish or affect the general rule that the Court enunciated, that standing is limited to the Attorney General (*see, Developments in the Law—Nonprofit Corporations*, 105 Harv L Rev 1578, 1597).

The New York general rule on standing is not only consistent with the common-law approach (*see, Herzog Found. v University of Bridgeport, supra* [after conducting nationwide analysis that included New York case law and secondary authority, concluded that donors do not have standing at common law]; *see also*, Note, *Charitable Trusts—Donor Standing Under the Uniform Management of Institutional Funds Act in Light of Carl J. Herzog Foundation, Inc. v University of Bridgeport*, 21 W New Eng L Rev 131, 137), but also with the approach taken by the Restatement (Second) of Trusts (*see*, § 391, comments *e*, *f*). With regard to this rule, one commentator has noted that, where funds are given for a charitable purpose, without a reservation of rights:

> "[t]here is no property interest left in the settlor or his heirs, devisees, next of kin, or legatees. The settlor or his successors may have a sentimental interest in seeing that his wishes are respected, but no financial [interest] * * * which the law recognizes * * * and hence neither he nor they are as a gen-

eral rule permitted to sue the trustees to compel them to carry out the trust * * * The better reasoned cases refuse to permit the settlor during his lifetime, or his successors after his death, to sue merely as settlor or successors to compel the execution of the charitable trust." (Bogert, Trusts and Trustees, ch 21, § 415 at 53 [2d rev ed].).

In holding that standing is generally restricted to the Attorney General, our courts have pointed out that a limited standing rule is necessary to protect charitable institutions from "vexatious litigation" by parties who do not have a tangible stake in the outcome of the litigation (*Alco Gravure v Knapp Found.*, *supra* at 466; *Matter of De Long*, *supra* at 1006). While the majority believes that this concern does not apply to Mrs. Smithers because her motives are altruistic (and I agree that they are), the limited standing rule enunciated by our Court of Appeals is a prophylactic one that does not permit a case-by-case inquiry into the subjective motivations of the party commencing the action. Rather, it focuses on the actual interest of the party and here Mrs. Smithers has herself conceded "that [she] ha[s] absolutely nothing to gain personally as a result of this lawsuit."

Notwithstanding the foregoing, plaintiff argues that donor standing, qua donor, is statutorily authorized by Not-For-Profit Corporation Law (N-PCL) § 522. Plaintiff's position is without merit. Section 522 of the N-PCL sets forth the procedure a donee institution must follow when it seeks to have gift restrictions released. Specifically, subdivision (a) provides:

"With the consent of the donor in a writing acknowledged by him, the governing board may release, in whole or in part, a restriction imposed by the applicable gift instrument on the use or investment of an institutional fund."

Plaintiff contends that, since the consent of the donor is required when an institution seeks to release gift restrictions, by necessary implication the statute grants the donor and his estate the right to take the initiative and commence an action to enforce the terms of the gift. Further consideration of the matter, however, shows otherwise.

Section 522 of the Not-For-Profit Corporation Law was modeled after section 7 of the Uniform Management of Institutional Funds Act (UMIFA) (*see*, Wyckoff, Practice Commentaries, McKinney's Cons Laws of NY, Book 37, N-PCL 522 at 190). In

the comment to section 7, the drafters of UMIFA expressly provided that the donor of a completed gift would not have standing to seek enforcement of its terms, stating:

"The donor has no right to enforce the [gift] restriction, no interest in the fund and no power to change the eleemosynary beneficiary of the fund. He may only acquiesce in a lessening of a restriction already in effect" (UMIFA § 7, comment, 7A ULA [part II] 504 [1999]).

When viewed against this backdrop it becomes apparent that, although section 522 may require the institution to obtain a donor's consent when it seeks to release gift restrictions, it does not confer standing upon a donor, and certainly not upon his estate, to affirmatively seek enforcement of those restrictions, a right that is the Attorney General's (see, Herzog Found. v University of Bridgeport, 243 Conn 1, 699 A2d 995, supra).[1]

The majority nevertheless asserts that donor standing, qua donor, was recognized by our Court of Appeals in Associate Alumni v General Theological Seminary (163 NY 417). It then goes one very significant step further, and asserts that, not only did Mr. Smithers have standing merely by virtue of his status as the donor of the gift, but that his standing somehow devolved to plaintiff as the representative of his estate. The majority's reliance upon Associate Alumni for these views is misplaced.

Examination of Associate Alumni shows that the alumni of a seminary contributed money for the endowment of a professorship on certain specified conditions. In doing so, however, the alumni retained significant rights, including the right of nomination on the expiration of the term of the professor and the right to assign the income from the endowment to an acting professor if the office became vacant. The alumni were also entitled to be furnished with an annual statement concerning the endowment funds and could alter the conditions of the endowment by joint action of the trustees of the seminary and themselves (see, 26 App Div 144). When a dispute arose concerning the term of the professorship, the alumni, via a corporation they had formed, commenced suit.

Initially, although the Court of Appeals permitted the action to proceed, it did not, as the majority claims, hold that a donor

---

1. The reason that the drafters of UMIFA sought to preclude any affirmative right of enforcement was to avoid the potential negative tax implications that would befall a donor if the rule were otherwise (see, Herzog Found. v University of Bridgeport, supra, 243 Conn at 14, 699 A2d at 1001).

has standing to seek enforcement of the terms of a gift merely because of its status as donor. Rather, the Court held that the alumni association had sufficient standing "as donor *and* possessor of the right to nominate to the professorship." (163 NY, *supra* at 422 [emphasis added].) Therefore, properly read, *Associate Alumni* held only that, where a donor has retained significant rights to control the charitable gift, it has standing to seek enforcement of the terms of the gift. Significantly, others who have considered *Associate Alumni* have similarly concluded that it represents an exception to the general rule restricting standing to the Attorney General (*see, Smith v Thompson,* 266 Ill App 165, 180; 18 NY Jur 2d, Charities § 41 at 236). Thus, contrary to the majority's position, *Associate Alumni* does not establish donor standing qua donor.

Any question as to this interpretation is resolved by the Court of Appeals' citation to section 744 of 2 Perry on Trusts (*see, Associate Alumni v General Theological Seminary, supra* at 422). The 1899 version of that treatise (published one year before the Court's decision), restates the common-law rule that, once a charitable gift is given, the "[h]eirs and personal representatives of a donor have no beneficial interest reverting or accruing to themselves from the breach or non-execution of a trust for a charitable use." A fortiori, persons having no beneficial interest in a completed gift fail to have a basis for a grant of standing.[2]

Distilled to their essentials, what emerges from the foregoing authorities is that there are three rules governing standing in this genre of litigation. First, a donor does not have standing to seek enforcement of a gift merely because he is the donor. Second, a donor who has retained certain rights to control the gift, i.e., a right to make staff appointments or exercise other decision-making authority concerning the use of the gift, may very well have standing. Third, the donor or his heirs may also have standing if the gift reverts to the donor or his heirs upon the failure to use the gift for its intended purpose. The corollary

---

2. Although the majority believes that *Associate Alumni*'s citation to *Mills v Davison* (54 NJ Eq 659, 35 A 1072) supports the conclusion that our Court of Appeals adopted a pure donor standing rule, it does not. The rule in New Jersey both before and after *Mills* has been that a donor generally lacks standing (*see, Ludlam v Higbee,* 11 NJ Eq 342; *Leeds v Harrison,* 7 NJ Super 558, 72 A2d 371). In fact, in *Leeds* (*supra,* 7 NJ Super at 575, 72 A2d at 380) the court specifically noted that there was standing in *Mills* not because plaintiffs were the donors but because they were *cestui que trust,* which means: "he for whose benefit the trust was created" (*see,* Black's Law Dictionary 221 [7th ed]).

to these rules is that the estate will lack standing if it has no interest in the gift after the donor's death, i.e., there is no provision for the gift, upon misuse, to revert to the estate. Bearing these rules in mind, the fundamental flaw in the majority's grant of standing in this case becomes evident.

The principal focus of the majority's analysis centers upon the question of whether Mr. Smithers had standing to commence an action. As to this question, I agree with the majority that *Associate Alumni* supports the view that he did since he seems to have retained the right to make appointments to key staff positions. This observation, however, is irrelevant to the question presented on this appeal. Here, we are not required to determine whether Mr. Smithers would have had standing, but whether his estate has standing.

With regard to this issue, and applying the rules of standing noted above, it is uncontroverted that the estate was not the donor of the gift. Thus, even if pure donor standing were recognized (as the majority concludes), this could not be a basis for granting standing to Mr. Smithers's estate. Next, to the extent that Mr. Smithers may have had standing based upon his right to exercise discretionary control over the gift, i.e., via the right to appoint key staffing positions (*see, Associate Alumni v General Theological Seminary, supra*), that right was personal to him, abated upon his death, and did not devolve to his estate (*cf.*, EPTL 7-2.3 [a]; *see, Wier v Howard Hughes Med. Inst.*, 407 A2d 1051 [Del]). Hence, as plaintiff concedes that the estate has no right to exercise control over the gift, this may not be a basis of standing. Finally, since it is uncontroverted that the estate does not have a right of reverter in the gift or, in fact, any right to control the gift by way of appointment to staff positions or otherwise, it follows that there is no retained interest that could support a claim of standing. In view of this, I fail to perceive the legal basis for the majority's grant of standing to plaintiff.

To all of this, the majority responds: "We have seen no New York case in which a donor attempting to enforce the terms of his charitable gift was denied standing to do so." It seems to me that this is hardly a basis upon which to grant standing to a decedent's estate, especially in view of all of the countervailing authority.

If there were any doubt as to the foregoing analysis, it seems to me that such doubt is resolved by N-PCL 522 (b). As indicated, subdivision (a) of N-PCL 522 requires an institution to obtain the consent of the donor in order to release gift

restrictions. Where, however, the donor's consent cannot be obtained by reason of his death, subdivision (b) merely requires the institution to apply to either the Supreme Court or Surrogate's Court (depending on the circumstances) for a release, and to notify the Attorney General of the application (*see,* N-PCL 522 [b]).

Significantly, the statute does not require the estate of a deceased donor to be made a party to the application. Nor does the statute even require that the estate be given notice of the application. If the estate's consent to the application is not required (and, as noted, there is not even a notification requirement), it is self-evident that the estate does not have standing to interpose itself, via an independent action, in what is, statutorily, a matter between the court, the Attorney General, and the charitable institution (*cf., Matter of Swan,* 237 App Div 454, *affd sub nom. Matter of St. John's Church,* 263 NY 638 [in an action to release gift restrictions, heirs of donor were not necessary parties since there was no right of reverter]; *see also, Wier v Howard Hughes Med. Inst., supra* [administrator of estate does not have standing to enforce the terms of a gift made by his decedent]).

The inappropriateness of permitting plaintiff to interpose herself in these circumstances is also highlighted by Executive Law § 63 (15). This section provides that:

> "In any case where the attorney general has authority to institute a civil action or proceeding in connection with the enforcement of a law of this state, in lieu thereof he may accept an assurance of discontinuance of any act or practice in violation of such law from any person engaged or who has engaged in such act or practice."

Exercising their statutorily-granted authority, two successive Attorneys General have entered into agreements with St. Luke's-Roosevelt Hospital Center concerning the direction of the charitable gift at issue. This action, no matter how viewed, seeks to set aside those agreements. The second of those agreements, via an Assurance of Discontinuance, addresses all of the issues concerning Mr. Smithers's gift, including a return of all monies that were diverted from their intended uses. The agreement further requires that it be submitted to Supreme Court for approval. What is evident is that the Attorney General and the hospital are following the precise statutory mandates found in Executive Law § 63 (15) and N-PCL 522 (b). By determining that plaintiff may pursue the instant action,

the majority necessarily concludes that a decedent's estate, which has no interest in a gift, may prevent the New York State Attorney General from exercising his discretion in determining how to prosecute alleged violations of law. This, it seems to me, is incongruous with the aforementioned statutes (*see, People v Bunge Corp.*, 25 NY2d 91).

In the end, the majority holds that a donor's estate has standing to commence an enforcement action against a charitable institution to which the donor contributed. The authorities I have cited establish that primary responsibility in this area is reposed in the Attorney General, and there is no authority supporting the majority's position that a donor's estate, in the absence of some continuing right in relation to the gift, has standing to enforce the terms of the gift.

Accordingly, I vote to affirm the order dismissing the complaint.

MAZZARELLI, J. P., and LERNER, J., concur with ELLERIN, J.; FRIEDMAN, J., dissents in a separate opinion.

Order, Supreme Court, New York County, entered December 18, 1998, modified, on the law, to grant plaintiff's motion for a preliminary injunction to the extent of staying disbursement of the proceeds on the sale of the East 93rd Street building, to deny defendants' motion to dismiss the complaint and to reinstate the complaint, and otherwise affirmed, without costs.