

Cite as 2016 Ark. App. 236

# ARKANSAS COURT OF APPEALS

DIVISIONS II & III
No. CV-15-503

| | |
|---|---|
| JANE LIPSCOMB STONE, Individually and as Executrix of the estate of MADOLENE STONE, deceased; BENJAMIN HICKS STONE, III; RUTH STONE JONES; MARGARET STONE COTTER; HARRIET STONE EVANS; PATRICIA MARTY STONE; EDWARD DURELL STONE, III; MARIA FRANCESCA STONE; FIONA CAMPBELL STONE; and MATTHEW WHELPLEY  APPELLANTS<br><br>V.<br><br>WASHINGTON REGIONAL MEDICAL CENTER and CITY OF FAYETTEVILLE, ARKANSAS  APPELLEES | Opinion Delivered: APRIL 27, 2016<br><br>APPEAL FROM THE WASHINGTON COUNTY CIRCUIT COURT [NO. CV-14-1288]<br><br>HONORABLE CRISTI BEAUMONT, JUDGE<br><br>SUBSTITUTED OPINION ON GRANT OF REHEARING; AFFIRMED |

## KENNETH S. HIXSON, Judge

This is an appeal from a decree quieting title to certain property in appellee

Washington Regional Medical Center ("WRMC"). Appellants, the heirs at law of the

original grantors, bring this appeal, arguing six points.[1] We affirm the circuit court.[2]

---

[1] Appellants are Jane Lipscomb Stone, individually and as executrix of the Estate of Madolene Stone, Deceased; Benjamin Hicks Stone III; Ruth Stone Jones; Margaret Stone Cotter; Harriet Stone Evans; Patricia Marty Stone; Edward Durell Stone III; Maria Francesca Stone; Fiona Campbell Stone; and Matthew Whelpley.

[2] On March 9, 2016, we issued an opinion affirming this case. On March 25, 2016, appellants petitioned for rehearing. We grant rehearing and issue this substituted opinion.



*Facts and Procedural History*

In 1906, Stephan (or S.K.) and Amanda Stone ("the Stones") owned block 37 of the original town plat of Fayetteville, Arkansas. The Stones decided to gift the property to the City of Fayetteville (the "City") "as a testimonial of our affection for the people among whom we have passed our lives." The purpose of the gift was to "establish and maintain permanently a hospital which shall be known as the Stone Hospital."

In September 1906, the Stones executed a Warranty Deed (the "1906 Deed") that conveyed the property to the City. The 1906 Deed contained a reverter clause which would cause the property to be conveyed back to the Stones or their heirs in the event that either of two triggering events occurred. The 1906 Deed further established a Stone Hospital Board of Control ("Board of Control") to operate the Stone Hospital.[3]

Despite the conveyance in 1906, by 1909 Stone Hospital still had not been established. In February 1909, the Stones executed another warranty deed in favor of the City (the "1909 Deed"). The 1909 Deed contained a recital that explained the reason why the second deed was created. The recital provided: "Whereas, in said [1906 Deed] there are certain conditions providing for a reversion of the premises which may tend to retard the establishment and maintenance of said Hospital." There were two significant differences between the 1906 Deed and the 1909 Deed. First, the 1906 Deed retained a possibility of reverter in the Stones which could "retard" the establishment of the Stone Hospital; while

---

[3] The Board of Control would consist of four members appointed by the City and seven named persons appointed from various churches. If there was a vacancy in one of the church positions that was not filled by that church within three months, the city council could fill the vacancy from the membership of that church.

the 1909 Deed omitted the language that created the possibility of reverter. Second, in the place of the possibility of reverter, the 1909 Deed added a condition to the conveyance which provided that if the hospital should change its location, the entire proceeds of the property should constitute a trust fund to be devoted to the maintenance of the hospital at the location selected; and, that any change in location would have to be approved by both the Board of Control named in the 1906 Deed and by the City.

The Stone Hospital was subsequently established and became operational in 1912. In 1914, the Board of Control petitioned the Washington County Circuit Court to be incorporated for the purpose of conducting a charitable hospital. The new corporation was known as Fayetteville City Hospital ("FCH"). The articles of incorporation were approved on April 30, 1914.[4]

The City owned and held legal title to the FCH property from 1906 until 1978, at which time the City transferred the FCH property to FCH. FCH continued to operate the facility until 1991. In July 1991, WRMC and FCH entered into an assignment and lease agreement. Under those agreements, WRMC operated a skilled-nursing and long-term-care facility on the FCH property.[5]

Unrelated to the WRMC/FCH lease agreement and the FCH property, in 2010 the City decided to construct a roundabout to ease traffic congestion near the WRMC campus

---

[4] Hereinafter, the property will be referred to as the "FCH property."

[5] As part of this transaction, FCH quitclaimed the property back to the City. This deed was executed by the Chairman of the Board of FCH, attested by the Secretary, and acknowledged. Any potential irregularity in the 1978 deed is moot because the 1991 deed revested title in the City.

in north Fayetteville. The City required one acre of land to construct the roundabout, and the City offered WRMC $172,500 for a one-acre parcel. Instead of accepting cash for the one-acre parcel, WRMC offered to swap the roundabout site in exchange for the FCH property owned by the City. After what can best be described as a series of legal maneuvers (which are discussed below), the City agreed to the land swap. Subsequently, the FCH property was conveyed to WRMC, and the WRMC property was conveyed to the City.

In July 2014, WRMC filed suit seeking to quiet title to the FCH property. The Stone heirs were named as defendants. The petition asserted that, although the 1906 Deed created the possibility of reverter in the Stones, that possibility of reverter was released by the 1909 Deed in favor of a conveyance in trust for the benefit of the City.

The Stone heirs responded, contending that because the City failed to establish the Stone Hospital and failed to operate it pursuant to the terms of the trust, its actions constituted a rejection of the trust, and that title should be quieted in appellants. The heirs later filed amended answers and counterclaims to have title reinvested in them. WRMC filed an amended petition adding the City as a party. The City answered and sought to have title to the property quieted in WRMC. The heirs amended their counterclaim and cross-claimed against the City.

WRMC filed a motion for summary judgment, asserting that it held legal title to the property, that it was in possession of the property, and that it had complied with all statutory-notice requirements for quiet-title actions. In an accompanying brief, WRMC argued that the Stones and their heirs did not retain any interest in the property after execution and delivery of the 1909 Deed. The City later adopted WRMC's summary-judgment motion

as its own. The heirs responded to WRMC's motion for summary judgment, arguing that WRMC did not hold legal title because the City held only an equitable title as beneficiary under the 1906 and 1909 Deeds.

## The Circuit Court's Decision

Following a hearing, an order was entered granting WRMC summary judgment and dismissing the heirs' counterclaim with prejudice, and granting the City summary judgment on the heirs' cross-claim against it. The court found that the 1906 and 1909 Deeds were clear and unambiguous and that both Deeds conveyed the property to the City. The court also found that the Stones intended for the 1909 Deed to release the possibility of reverter retained by them in the 1906 Deed. The court concluded that the release of the possibility of reverter had the effect of vesting title to the property in the City in fee simple absolute. The court also found that the FCH board of directors was the successor to the Stone Hospital Board of Control established in the 1906 Deed, and that the FCH board and the City properly took the required corporate actions to approve the relocation of the city hospital to another location. The court then concluded that WRMC had established all of the elements necessary to sustain a decree quieting title. Based on the entry of the order granting summary judgment, a separate decree quieting title to the property in WRMC was also entered. This appeal followed.

## Standard of Review

Summary judgment may be granted only when there are no genuine issues of material fact to be litigated, and the moving party is entitled to judgment as a matter of law. *Walls v. Humphries*, 2013 Ark. 286, 428 S.W.3d 517. On appellate review, we determine

SLIP OPINION

if summary judgment was appropriate based on whether the evidentiary items presented by the moving party in support of the motion leave a material fact unanswered. *Id.* Our review focuses not only on the pleadings, but also on the affidavits and documents filed by the parties. *Id.*

*Discussion*

While the appellants separate their arguments into several points and subpoints, this case has two overarching issues on appeal. The first issue is whether the Stones' heirs have any interest, reversionary or otherwise, in the FCH property. We affirm the circuit court's finding that the Stones' heirs do not have any interest in the FCH property. However, that holding does not end our inquiry. The appellants have also contended on appeal that WRMC did not satisfy its burden of proving that it was entitled to quiet title in the FCH property. Specifically, the appellants contend that WRMC does not have legal title to the FCH property. We disagree, and we affirm the circuit court's finding that the legal title to the FCH property is quieted in WRMC.

*Point I:   Whether the Stone Heirs Have Any Interest in the FCH Property*

To determine whether the appellants have any interest in the FCH property, one must analyze the 1906 Deed and the 1909 Deed. The 1906 Deed clearly conveyed title to the FCH property from the Stones to the City. The 1906 Deed retained a possibility of reverter in the Stones in the event either of two events occurred. The first event would be triggered if the City failed to establish and operate a hospital on the FCH property within four years. The second event would be triggered if, after the hospital was established, the



FCH property was abandoned or no longer used for hospital purposes. In either event, title to the FCH property would revert back to the Stones or their heirs.

The evidence indicates that, three years later, the hospital had not yet been established and put into operation. The first triggering event of reversion was approaching. The Stones and the City realized that the reversionary language in the 1906 Deed could affect (or as the Stones put it, "retard") the establishment and maintenance of the hospital. To eliminate the effect of a potential reversionary interest, the Stones executed another deed in 1909, which eliminated the possibility of reverter held by the Stones. A recital in the 1909 Deed states:

> Whereas, in the said deed of September 8th, 1906, there are certain conditions providing for a reversion of the premises which may tend to retard the establishment and maintenance of said hospital.

The operative language provides:

> Therefore, the said parties of the first part [the Stones] in consideration of the premises and of one dollar to them paid by said party of the second part [City of Fayetteville], and for the purposes here effectually securing to said city and its inhabitants the benefits of such Hospital, do hereby grant, bargain, sell and convey unto said [City of Fayetteville], the lands and premises above described to be by the said city, held in trust and maintained as a city hospital.

> And, in case it should be determined hereafter to change the location of said Hospital, to some other point in said city, in such case the entire proceeds of the above described premises shall constitute a trust fund to be devoted exclusively to the establishment and maintenance of such city Hospital at the point selected [.]

It is clear from a plain reading of the 1906 Deed that the Stones originally conveyed the FCH property to the City retaining a possibility of reverter, which could be triggered by either of two events. It is equally clear that, three years later, the Stones eliminated the possibility of reverter created in the 1906 Deed and instead substituted a new condition on

the conveyance that in the event the hospital is moved to a new location, the proceeds derived from the FCH property shall be retained in trust and said proceeds were to be used exclusively for the establishment and maintenance of the new City hospital at the new location.

The appellants contend that the trial court erred in finding that the 1909 Deed released their possibility of reverter in the FCH property. We disagree. The Stones retained a property interest in the FCH property by virtue of their retained possibility of reverter in the 1906 Deed. While Arkansas courts have not addressed the precise issue of whether a grantor who retains a possibility of reverter releases and extinguishes that interest by making a subsequent conveyance of the property to the party in possession of the determinable fee, that is the uniformly held view of those American jurisdictions that have considered the question. *See Brill v. Lynn*, 270 S.W. 20 (Ky. 1925) ("The courts both of this country and of England . . . announce it as a principle of law that a possibility of reverter may be released by the grantor to the holder of the defeasible fee."); *Atkins v. Gillespie*, 299 S.W. 776 (Tenn. 1927) ("Possibility of reverter, being a vested interest in real property, is capable at all times of being released to the person holding the estate on condition, or his grantee, and if so released, vests an absolute and indefeasible title thereto."); *Smith v. Sch. Dist. No. 6*, 250 S.W.2d 795 (Mo. 1952) ("[T]he authorities are well agreed that a possibility of reverter after a determinable fee is capable of being released to the tenant in fee simple determinable or a third party. Such a release has the effect of turning the determinable or qualified fee into a fee simple absolute."); *Long v. Long*, 343 N.E.2d 100 (Ohio 1976); *Wash. State Grange v. Brandt*, 148 P.3d 1069 (Wash. App. 2006); *W.A. Foote Mem'l Hosp. Inc. v. City of Jackson*

*Hosp. Auth.*, 211 N.W.2d 649 (Mich. 1973); *Copenhaver v. Pendleton*, 155 S.E. 802 (Va. 1930); *O'Connor v. City of Saratoga Springs*, 262 N.Y.S. 809 (N.Y. Sup. Ct. 1930); *El Dorado Land Co., L.P. v. City of McKinney*, 395 S.W.3d 798 (Tex. 2013); *In re Application of Mareck*, 100 N.W.2d 758 (Minn. 1960); *London v. Kingsley*, 81 A.2d 870 (Pa. 1951); *Vaughn v. Langford*, 62 S.E. 316 (S.C. 1908).

We hold that the 1909 Deed effectively released and terminated any rights of reversion held by the Stones that were created by the 1906 Deed. While the appellants argue that the trial court erred in finding that the 1906 and 1909 Deeds were unambiguous, we cannot agree. We will not resort to rules of construction when a deed is clear and contains no ambiguities, but only when its language is ambiguous, uncertain, or doubtful. *Winningham v. Harris*, 64 Ark. App. 239, 981 S.W.2d 540 (1998). An instrument is unambiguous and its construction and legal effect are questions of law when its terms are not susceptible to more than one equally reasonable construction. *Fryer v. Boyett*, 64 Ark. App. 7, 978 S.W.2d 304 (1998). In this case, in finding that the language in the 1909 Deed unambiguously evidenced the intent to release the possibility of reverter, the trial court noted that the Stones were familiar with the language necessary to create conditional limitations and a possibility of reverter as demonstrated by the clear language in the 1906 Deed. Because there was an absence of any such language within the four corners of the 1909 Deed, the trial court determined from the only reasonable construction of the two deeds was that the Stones intended through delivery of the 1909 Deed to release the possibility of reverter. We agree with the trial court's interpretation of the deeds, with the

result being that the Stones effectively conveyed the entirety of their interest to the City and had no remaining interest in the property at issue.

The appellants advance an alternative argument that the City has breached its fiduciary duties in its administration of the charitable trust created by the 1909 Deed. However, we hold that the appellants do not have standing to make such an argument. Questions of standing are subject to de novo review in Arkansas as standing constitutes a matter of law. *Ark. Hotels and Entm't, Inc. v. Martin*, 2012 Ark. 335, 423 S.W.3d 49. The common-law rule on who has standing to sue to enforce a charitable trust was articulated in the Restatement (Second) of Trusts, § 391 (1959):

> A suit can be maintained for the enforcement of a charitable trust by the Attorney General or other public officer, or by a co-trustee, or by a person who has a special interest in the enforcement of a charitable trust, but not by persons who have no special interest or by the settlor or his heirs, personal representatives or next of kin.

*See also Carl J. Herzog Found., Inc. v. Univ. of Bridgeport*, 699 A.2d 995 (Conn. 1997). The Arkansas Supreme Court has stated that "[w]hen reviewing trust cases in Arkansas, we have followed the Restatement Second of Trusts." *Wisener v. Burns*, 345 Ark. 84, 89, 44 S.W.3d 289, 292 (2001).[6] Where a party does not possess an interest in real property, that party does not have standing to raise any issue concerning the real property. *Forrest Constr. Inc. v. Milam*, 345 Ark. 1, 43 S.W.3d 140 (2001). Furthermore, even were we to conclude that the appellants had standing to raise the issue, it is not yet ripe for decision. In its petition to

---

[6] We recognize that in 2005 the General Assembly enacted legislation providing that the settlor of a charitable trust may maintain a proceeding to enforce the trust. *See* Ark. Code Ann. § 28-73-405(c) (Repl. 2012). However, because the appellants herein are heirs of the settlor and not the settlor, this provision is inapplicable.

quiet title, WRMC expressed its intention to sell the FCH property and designate the sale proceeds to construct an endovascular neurosurgical operating room, which arguably would constitute the establishment or maintenance of the hospital, which was the donative intent of the Stones. Therefore, any potential conduct breaching the trust, if any exists, has not yet transpired.

*Point 2: Whether WRMC Proved Its Prima Facie Case for Quiet Title*

A prima facie case to quiet title requires a showing that the plaintiff has legal title to the property and possesses it. *Koonce v. Mitchell*, 341 Ark. 716, 19 S.W.3d 603 (2000). The appellants contend that because WRMC did not have legal title to the FCH property, it did not prove a prima facie element in its petition to quiet title.

To determine whether WRMC has legal title, one must review its chain of title.

• In 1906, the FCH property was conveyed by the Stones to the City with reversionary interests in the Stones.

• In 1909, the FCH property was reconveyed by the Stones to the City without the reversionary interest in the Stones but with the condition that in the event the hospital changed locations, the proceeds from the property should be held by the City in trust for the establishment and maintenance of a hospital at a new location.[7]

• In 1912, the hospital opened as Stone Hospital.

• In 1914, the hospital was reorganized as FCH, a charitable corporation, which provided medical treatment for patients, both charitable and for compensation. The

---

[7] This new condition clearly presupposes or anticipates a future sale of the FCH property with the proceeds therefrom held in trust for the establishment and maintenance of a hospital at a different location.

language that created the membership of the Board of Control in the 1906 Deed was adopted in the Articles of Association of FCH, which created a Board of Directors. FCH's Board governed FCH, and FCH operated the facility until 1991.

• In 1978, the City conveyed the FCH property to FCH. The conveyance was authorized by resolution of the city council.[8]

• In 1991, FCH quitclaimed the FCH property back to the City[9] and FCH leased the facility to a subsidiary of WRMC to be used for the business of providing health care or any other purpose incidental or related thereto. The lease was signed by FCH's Chairman of the Board, attested to by the Secretary, and properly acknowledged.

• In 2011, the City conveyed the FCH property to WRMC. This conveyance was approved by both the FCH board and the city council.

The appellants contend, *inter alia*, that the conveyance from the City to WRMC in 2011 should be set aside. We disagree. After the FCH property was leased to WRMC in 1991, the FCH Board did not meet for approximately twenty years. According to the Articles of Association, the FCH board consisted of eleven members, four of whom could be appointed by the City. By 2011, only four of the existing FCH Board members could be located. The City, through proper city resolutions, appointed two new members to the FCH Board. The newly comprised FCH board met on July 18, 2011, with a majority of the members being present. The FCH board duly resolved and authorized the liquidation

---

[8] See footnote 5.

[9] See footnote 5.

and dissolution of FCH, a charitable corporation, and the transfer of all of its assets to WRMC. The FCH Board also recognized WRMC as its successor non-profit city hospital.

Shortly after FCH dissolved and transferred all of its assets to its successor, WRMC, the City took appropriate steps to convey the FCH property to WRMC. In September 2011, the City passed a resolution and ordinance approving the transfer of the FCH property by quitclaim deed to WRMC. On October 6, 2011, the City executed and delivered a quitclaim deed to the FCH property to WRMC.

WRMC showed that it had both legal title to the FCH property and was in possession. It also showed that there was compliance with the provisions of the 1909 Deed requiring approval of both the city council and the FCH board, as the successor to the Stone Hospital Board of Control, to convey the property from the City to WRMC for relocation of the hospital to another location. From our review of the record, we are satisfied that WRMC met all of the elements necessary to sustain its quiet-title action. Therefore, we conclude that the circuit court correctly quieted title to the FCH property in WRMC.

Finally, the heirs argue that the circuit court erred in finding that FCH was not an indispensable party. The circuit court found that there was insufficient evidence to determine whether FCH, as the successor in interest to the Stone Hospital Board of Control, was a necessary party. Joinder of FCH would be proper only if FCH had an interest in the real property. *See Eason v. Flannigan*, 349 Ark. 1, 75 S.W.3d 702 (2002). However, the burden of proof rests on the party raising the defense—here, the Stone heirs—to "show that the person who was not joined is needed for a just adjudication." *Am. Gen. Life & Accident Ins. Co. v. Wood*, 429 F.3d 83, 92 (4th Cir. 2005); *accord Citizen Band Potawatomi Indian*

*Tribe of Okla. v. Collier*, 17 F.3d 1292, 1293 (10th Cir. 1994); *Ilan-Gat Eng'rs, Ltd. v. Antigua Int'l Bank*, 659 F.2d 234, 242 (D.C. Cir. 1981); 7 Charles Alan Wright, Arthur R. Miller, and Mary Kay Kane, *Federal Practice and Procedure* § 1609 (3d ed. 2001). Because the heirs failed to meet their burden of showing that FCH was needed for a just adjudication, we cannot say that the circuit court erred in not finding that FCH was an indispensable party. Furthermore, it is apparent from the record that FCH is no longer a legal entity, having passed a resolution in 2011 to liquidate and dissolve the corporation.

Affirmed.

KINARD, WHITEAKER, VAUGHT, HOOFMAN, and BROWN, JJ., agree.

*Ledbetter, Gogbill, Arnold & Harrison, LLP*, by: *R. Ray Fulmer*, *Victor L. Crowell*, and *Joseph Karl Luebke*, for appellants.

*Thomas J. Olmstead* and *Andrew C. Cozart*, for appellee Washington Regional Medical Center.

*Kit Williams* and *Blake Pennington*, for appellee City of Fayetteville.